PROPRIETORS OF MOUNT HOPE CEMETERY *vs.* CITY OF BOSTON & others.

Suffolk.    November 23, 1892. — April 3, 1893.

Present: FIELD, C. J., ALLEN, HOLMES, KNOWLTON, MORTON, LATHROP, & BARKER, JJ.

*Mandamus — Statute — Constitutional Law — Obligations of City or Town — Police Power — Private Corporation.*

The St. of 1889, c. 265, requiring the city of Boston, without compensation, to transfer the Mount Hope Cemetery to the corporation called "The Proprietors of Mount Hope Cemetery," is unconstitutional. The cemetery falls within the class of property which the city owns in its private or proprietary character, as a private corporation might own it, and its ownership is protected under the Constitution of Massachusetts, Art. X. of the Declaration of Rights, and the Constitution of the United States, Fourteenth Amendment, so that the Legislature has no power to require its transfer without compensation.

The Legislature cannot require a city or town, without compensation, to transfer property which it has bought in order to enable it to discharge its statutory obligations, while at the same time its duties and obligations continue to rest upon it.

The legislative power over municipal property, when it exists, does not extend so far as to enable the Legislature to require a transfer, without compensation, to a private person or private corporation.

A corporation does not become a public one merely by receiving a charter from the Legislature, by owing certain duties to the public, and by being subject to rules and regulations established in the exercise of the police power, and that power does not extend so far as to include a right to require the transfer of property to another person without compensation.

The corporation known as the Proprietors of Mount Hope Cemetery, incorporated under St. 1889, c. 265, falls within the class of private corporations.

PETITION for a writ of mandamus to compel the city of Boston and its mayor to convey Mount Hope Cemetery to the petitioners, in accordance with St. 1889, c. 265.* Upon motion,

---

* This statute is entitled " An act to provide for the transfer and management of Mount Hope Cemetery in the city of Boston."

The first three sections created the corporation and provided for its organization. The fourth and fifth sections are as follows :

" Sect. 4. Immediately upon the organization of said corporation said city of Boston shall convey to it, by proper deed, all the lands constituting said cemetery, together with the stock, tools, implements, and other personal property pertaining thereto, or commonly used thereon, and with the right to any unpaid balances remaining due for lots already sold, to be held by said corporation, so far as consistent herewith, for the same uses and purposes, and charged with the same duties, trusts, and liabilities for and subject to which the same are now held by said city ; and the said corporation shall thenceforth have the entire charge of said cemetery, and of the care of lots and graves therein ; and to that end shall receive from said city the annual income, as it accrues, of the funds now held by said city under the provisions of section seventeen of chapter eighty-two of the public statutes, and apply said income to the preservation and care of the lots entitled to such application ; and the said corporation shall have in respect of said cemetery all rights, powers, and privileges, and be subject to all duties, obligations, and liabilities, now had or sustained by said city in respect thereof, and shall fully indemnify and hold harmless the said city in regard to the same.

" Sect. 5. The said city shall continue to have the right of burial of persons, for whose burial it is now or shall hereafter be bound by law to provide, in that portion of the westerly end of said cemetery bounded and described in section one, and interments of such persons may either be there made by said city at its own expense, or by said corporation, upon such terms for the cost of preparation and interment as may from time to time be agreed upon between the overseers of the poor of said city and the executive board of said corporation."

John Taylor and others, owners of lots in said cemetery, who had paid to the city certain sums of money, which constituted part of the funds mentioned in § 4 of said act, and held by the city in trust to use the income in the perpetual care of lots, were permitted to appear as respondents and file an answer. Hearing before *Knowlton*, J., who made certain findings of fact, and reserved the case for the full court on the petition, answers, and such of his findings as were competent to be considered. The facts material to the decision are stated in the opinion.

*W. Gaston & J. B. Richardson,* (*S. W. Creech, Jr.* with them,) for the petitioners.

*T. M. Babson,* for the city of Boston.

*S. D. Charles,* for John Taylor and others.

ALLEN, J.  Over property which a city or town has acquired and holds exclusively for purposes deemed strictly public, that is, which the city or town holds merely as an agency of the State government for the performance of the strictly public duties devolved upon it, the Legislature may exercise a control to the extent of requiring the city or town, without receiving compensation therefor, to transfer such property to some other agency of the government appointed to perform similar duties, and to be used for similar purposes, or perhaps for other purposes strictly public in their character.  Thus much is admitted on behalf of the city, and the doctrine is stated and illustrated in many decisions.  *Weymouth & Braintree Fire District* v. *County Commissioners,* 108 Mass. 142.  *Whitney* v. *Stow,* 111 Mass. 368.  *Rawson* v. *Spencer,* 113 Mass. 40.  *Stone* v. *Charlestown,* 114 Mass. 214.  *Kingman, petitioner,* 153 Mass. 566, 573. *Meriwether* v. *Garrett,* 102 U. S. 472.  *Mayor, &c. of Baltimore* v. *State,* 15 Md. 376.

By a quite general concurrence of opinion, however, this legislative power of control is not universal, and does not extend to property acquired by a city or town for special purposes not deemed strictly and exclusively public and political, but in respect to which a city or town is deemed rather to have a right of private ownership, of which it cannot be deprived against its will, save by the right of eminent domain with payment of compensation.  This distinction we deem to be well founded, but no exact or full enumeration can be made of the kinds of prop-

erty which will fall within it, because in different States similar kinds of property may be held under different laws and with different duties and obligations, so that a kind of property might in one State be held strictly for public uses, while in another State it might not be. But the general doctrine that cities and towns may have a private ownership of property which cannot be wholly controlled by the State government, though the uses of it may be in part for the benefit of the community as a community, and not merely as individuals, is now well established in most of the jurisdictions where the question has arisen. *Board of Commissioners* v. *Lucas*, 93 U. S. 108, 114, 115. *Mount Pleasant* v. *Beckwith*, 100 U. S. 514, 533. *Railroad Co.* v. *Ellerman*, 105 U. S. 166, 172. *Cannon* v. *New Orleans*, 20 Wall. 577. *Mayor, &c. of New York* v. *Second Avenue Railroad*, 32 N. Y. 261. *People* v. *Batchellor*, 53 N. Y. 128. *People* v. *O'Brien*, 111 N. Y. 1, 42. *Webb* v. *Mayor, &c. of New York*, 64 How. Pr. 10. *Montpelier* v. *East Montpelier*, 29 Vt. 12. *Western Saving Fund Society* v. *Philadelphia*, 31 Penn. St. 175. *People* v. *Detroit*, 28 Mich. 228, 235, 236, 238. *People* v. *Hurlbut*, 24 Mich. 44. *Detroit* v. *Detroit & Howell Plank Road*, 43 Mich. 140. *Thompson* v. *Moran*, 44 Mich. 602. *Louisville* v. *University of Louisville*, 15 B. Mon. (Ky.) 642. *Richland* v. *Lawrence*, 12 Ill. 1. *People* v. *Mayor, &c. of Chicago*, 51 Ill. 1. *Grogan* v. *San Francisco*, 18 Cal. 590. *Hewison* v. *New Haven*, 37 Conn. 475. The same conclusion is arrived at, after a full and clear discussion of the subject, in Dillon, Mun. Corp. (4th ed.) §§ 66–68, and notes. See also Cooley, Taxation, 688.

In this Commonwealth the question has not directly arisen in reference to the power of the Legislature to compel a transfer of the property of a city or town, but the double character of cities and towns in reference to their duties and liabilities has very often been adverted to. When a city or town acts merely as an agent of the State government in performing duties for the general benefit, it is usually held free from liability to persons who sustain injuries through negligence, except in the case of defective highways, which constitute an exception to the general rule. But in other cases, where an element partly commercial comes in, a liability is usually enforced. *Tindley* v. *Salem*, 137 Mass. 171, 172, and cases cited. *Worden* v. *New Bedford*, 131

Mass. 23.   *Bailey* v. *Mayor, &c. of New York,* 3 Hill, (N. Y.)
531.   In such cases, the ultimate question usually is, Did the
Legislature mean that the city or town, or other creature of
statute, should be liable for negligence, or did it not?   *Howard*
v. *Worcester,* 153 Mass. 426.   *Southampton & Itchin Bridge* v.
*Southampton,* 8 El. & Bl. 801, 812.   *Cowley* v. *Mayor, &c. of
Sunderland,* 6 H. & N. 565, 573.   *Mersey Docks* v. *Gibbs,* 11
H. L. Cas. 686, 707, 709, 710, 721.   But in determining this ques-
tion courts make a discrimination in respect to the character of
the duties and of the property which are involved.   Nowhere else
has this ground of distinction been more often or more strongly
insisted on than in Massachusetts.   See cases cited in *Tindley* v.
*Salem,* 137 Mass. 171, 174; *Pratt* v. *Weymouth,* 147 Mass. 245,
254; *Neff* v. *Wellesley,* 148 Mass. 487, 493; *Lincoln* v. *Boston,*
148 Mass. 578; *Curran* v. *Boston,* 151 Mass. 505, 508.   In the
recent case of *Merrimack River Savings Bank* v. *Lowell,* 152
Mass. 556, we had occasion to make an analogous discrimination
between the general duty which the city of Lowell was under to
furnish water on equal terms to all its inhabitants, and the par-
ticular undertaking to furnish water for a year to an individual
who had paid a year's rates in advance.

In the case before us, we have to determine whether the title
of the city of Boston to the Mount Hope Cemetery is subject to
legislative control, and this involves an inquiry to some extent
into the usages and laws in this Commonwealth relating to bury-
ing grounds, with a view of ascertaining whether, in the owner-
ship of such property, towns have heretofore been regarded or
have acted merely as agencies of the State government.

In early times, when land was set apart for a burying ground,
it was sometimes under the care and control of the town or
district, and sometimes under that of the parish.   It is said in
*First Parish in Shrewsbury* v. *Smith,* 14 Pick. 297, 301, " The
fact probably was, that towns, parishes, and proprietors often
consisted so nearly of the same individuals, that a grant or
appropriation of one of these bodies to another was little more
than an appropriation by themselves in one capacity, to the use
of themselves in another "; and in *Lakin* v. *Ames,* 10 Cush.
198, 218, " Although in early times the establishment, care, and
control of burial grounds, like the support of schools, might have

been partly a parochial and partly a municipal duty, yet before the erection of a new parish in the town of Pepperell, in 1831, they were regarded as appertaining rather to towns than to parishes." We cannot find either in the statutes or the history of Massachusetts any clear line of distinction between the duty or usages of towns and of parishes in this respect. Sometimes land was set apart or bought and owned by the town or district for this purpose, and sometimes by the parish. Instances of ancient ownership by towns, by districts, and by parishes are referred to in *First Parish in Shrewsbury* v. *Smith*, 14 Pick. 297; *Bachelder* v. *Wakefield*, 8 Cush. 243; and *Lakin* v. *Ames*, 10 Cush. 198; and there appears to be no doubt that money for providing, enlarging, and maintaining them was raised by each of these corporate bodies. More than two hundred years ago the town of Boston bought land for burying grounds, the Chapel, Copp's Hill, and the Granary burying grounds being the earliest. Shurtleff's Top. & Hist. Description of Boston, 182 *et seq.* 1 Memorial Hist. of Boston, 554, 555; 2 ibid. 528, 529. In the general legislation of the Commonwealth, burying places, whether belonging to towns, districts, parishes, or precincts, were early spoken of, in connection with other pieces of land, as " appropriated for the general use, ease, or convenience of the community," and provision was made for defining their boundaries and protecting them from encumbrances. St. 1786, c. 67, § 7, and c. 81, § 6, re-enacted in Rev. Sts. c. 24, §§ 61, 63. By St. 1828, c. 141, § 1, the First Parish in Rowley was authorized to assess a tax for the enlargement of its burial ground, or to purchase a new one, on all polls within the territorial limits of the said parish, and on estates within said limits, for the use and benefit of all the inhabitants living within said limits and their successors forever.

No general statute which in express terms authorizes the expenditure of money for the purchase and care of land for this purpose has been found earlier than St. 1828, c. 107, in which towns, districts, and parishes or religious societies are all put on the same footing. The statute is as follows: " Be it enacted . . . that the inhabitants of each town, district, parish, or religious society within this Commonwealth, qualified to vote in town, district, or parish meetings, shall have power, at any

meeting called for that purpose, to raise, in the same manner that other town, district, or parish charges may now by law be raised, such sum or sums of money as they shall deem necessary for the purchase of lands for burial grounds, and for the care and preservation of the same." This, as we believe, was merely giving the express sanction of law to what had long been a prevailing usage. The above statute, when incorporated into the Revised Statutes, was divided, the part relating to towns being contained in Rev. Sts. c. 15, § 12, (which included districts, Rev. Sts. c. 2, § 6, cl. 17,) and that relating to parishes being found in Rev. Sts. c. 20, § 18.

The time when exclusive rights of burial in particular lots were first assigned or sold to families or individuals is involved in some obscurity. The power to do this also was probably at first assumed by towns and parishes, and afterwards had the sanction of express legislation. Before the year 1715, private tombs were in use in the Chapel burying ground, and others were added from time to time in that and the other burying grounds of Boston. Shurtleff's Top. & Hist. Description of Boston, 186–193, 200–205, 212, 213, 233, 244, 249, 250. These tombs were sometimes built, it would seem, by individuals, and sometimes by the town and sold to individuals. In an investigation before a committee of the city council of Boston in 1879 concerning the expediency of prohibiting further interments in the King's Chapel and Granary burying grounds, much information as to the early usages in respect to burials and burial rights was brought out, as shown in City Documents of 1879, Nos. 47 and 96, where extracts from the town records are printed. It seems that as early as 1721, and in the succeeding years, the privilege of building a tomb in the Granary burying ground, and probably in the others also, was usually granted by the town officers to any applicant, without direct compensation for the land, but upon certain prescribed conditions as to making and maintaining the wall, and paying a proportion of the expense of a drain. In 1738 certain tombs appear to have been built for the town, and afterwards disposed of by the selectmen; and in 1807 a tomb was sold for $300, and the town assumed control of tombs whose owners had failed to keep them in repair and were out of reach, and voted to " sell them for the advantage of the

town." Tombs so held by individuals were private property, and transferable as such. An instance of such a sale is found referred to in the town records in 1802, and another in 1807. By St. 1822, c. 93, § 8, tombs in use were exempted from attachment and execution, and in the Rev. Sts. c. 97, § 22, cl. 7, this exemption was extended to rights of burial. This exemption was not limited to tombs and rights of burial in private soil, but clearly included rights possessed by individuals in the public or common burying grounds.

The first private incorporated cemetery company, so far as ascertained, was the Massachusetts Horticultural Society, which by St. 1831, c. 69, was authorized to appropriate a part of its land for a rural cemetery or burying ground; to lay out lots for family and other burying places; and to grant exclusive rights of burial. This was the origin of the cemetery at Mount Auburn, and a new corporation was formed under St. 1835, c. 96, by the name of the Proprietors of the Cemetery at Mount Auburn, which succeeded to the property, powers, and privileges of the Horticultural Society in respect to the cemetery; with the restriction, however, that all of the proceeds of sales of lots which said proprietors were allowed to retain should be forever devoted and applied to the preservation, improvement, embellishment, and enlargement of the cemetery and garden, and the accidental expenses thereof, and for no other purpose whatsoever. This would effectually cut off all right to declare dividends. After this charters for private cemetery companies were not infrequent. See Sts. 1836, c. 46; 1837, c. 130. By St. 1834, c. 187, § 1, re-enacted in Rev. Sts. c. 130, § 21, a penalty was imposed for making a road, canal, etc. " over, through, in, or upon such part of any enclosure, being the property of a town, parish, religious society, or of private proprietors, as may be used or appropriated for the burial of the dead," without consent first obtained. The first general law authorizing the organization of cemetery companies was St. 1841, c. 114, under which any ten or more persons might organize as a corporation for the purpose of establishing a cemetery, with power to take and hold real and personal estate, which should be applied exclusively to purposes connected with and appropriate to the objects of such organization, and with power to lay out lots and to grant exclusive rights of burial.

The cemeteries owned by towns and cities and parishes were called and considered to be public cemeteries, because they were provided and maintained primarily at the expense of the public. In early times, the parishes were virtually, if not strictly, public corporations.  The rights of individuals who were not owners of tombs or lots or burial rights therein must have been subject to such rules and regulations as were established in particular places. An ancient burying ground, where persons of different families were buried, was easily inferred to be a public burying ground. *Commonwealth* v. *Viall*, 2 Allen, 512.  *Commonwealth* v. *Wellington*, 7 Allen, 299.  But the use of the word "public" by no means implied that exclusive rights to tombs, lots, and burials did not exist therein, by assignment or purchase.  By St. 1848, c. 79, relating to a "public cemetery" in the city of Roxbury, express authority was given to the city council to grant exclusive rights of burial, the proceeds to be paid into the city treasury, and kept separate and devoted to cemetery purposes.  By Sts. 1855, c. 44, and 1854, c. 390, the cities of Cambridge and Worcester respectively were authorized to manage cemeteries, with a right to sell lots, the proceeds to go in each instance into the city treasury.  The use of the term "public burial places," as applied to burial places owned by cities or towns, in which lots are sold to individuals, still continues.  Pub. Sts. c. 82, § 17. An example showing that towns were accustomed to sell burial lots to individuals is found in *Fay* v. *Milford*, 124 Mass. 79.

Such being the laws and usages of the Commonwealth before the time when the city of Boston made its first purchase of the Mount Hope Cemetery, the city, by St. 1849, c. 150, was "authorized to purchase and hold land for a public cemetery in any town in this Commonwealth, and to make and establish all suitable rules, orders, and regulations for the interment of the dead therein, to the same extent that the said city of Boston is now authorized to make such rules, orders, and regulations for the interment of the dead within the limits of the said city."

Before any purchase under this statute was made, a general statute was passed which included Boston, St. 1855, c. 257, § 1, providing that " Each city and town in the Commonwealth shall provide one or more suitable places for a burial ground, within which the bodies of persons dying within their respective limits

may be interred," and forbidding the use for the burial of the dead of any land in any city or town other than that already used or appropriated for that purpose, without permission. It also was, and long had been, the duty of the overseers of the poor of each town to bury paupers and indigent strangers dying therein. St. 1793, c. 59, §§ 9, 13. Rev. Sts. c. 46, §§ 13, 16. (See also, for later statutes on the same subject, Gen. Sts. c. 70, §§ 12, 15; Pub. Sts. c. 84, §§ 14, 17, enlarging their duties.) Being under these positive duties, and having authority under St. 1849, c. 150, to go outside of the city limits for a burial ground, the city of Boston purchased the largest portion of the land of the Mount Hope Cemetery in West Roxbury in 1857, and has since added to the same at various times, and has received large sums from the sale of lots or burial rights, and has expended large sums in the care and management thereof, and about forty acres still remain unsold. There is no suggestion in argument that in any of these particulars it has acted beyond its powers.

We are not aware that the sale of burial rights in this cemetery has ever been limited to inhabitants of Boston. No such limitation is expressed in the ordinance, but sales may be made to any person or persons. Rev. Ordinances, 1885, c. 47, § 4. By St. 1877, c. 69, § 7, re-enacted in Pub. Sts. c. 82, § 15, towns may sell exclusive burial rights to any persons, whether residents of the town or otherwise, in their cemeteries; and this right extends to cities. Pub. Sts. c. 3, § 3, cl. 23. There can be no doubt that the city held this cemetery not only for the burial of poor persons, but with the right to make sales of burial rights to any persons who might wish to purchase them, whether residents or non-residents. With these duties, and also with these rights and privileges, the city has acquired and improved this property. It is not as if the land had been procured and used exclusively as a place for the free burial of the poor, or of inhabitants of Boston. In addition to these purposes, the city has been enabled to provide a well ordered cemetery, with lots open to purchase, under carefully prepared rules and regulations, and thus to afford to its inhabitants the opportunity to buy burial places without being compelled to resort to private cemetery companies, where the expense would probably be greater; and it has done this upon such terms that the burial of its paupers has been prac-

tically without expense in the past, and it has about forty acres remaining, the proceeds of which when sold would go into the city treasury but for the requirement of St. 1889, c. 265.

The St. of 1889, c. 265, requires the city to transfer to the newly formed corporation, called "The Proprietors of Mount Hope Cemetery," without compensation, this cemetery, with the personal property pertaining thereto, and with the right to any unpaid balances remaining due for lots already sold, and the annual income of certain funds held for the perpetual care of lots. If such transfer is made, all that the city would retain would be the right to bury such persons as it is or may be by law obliged to bury in a certain prescribed portion of the cemetery. Its previous conveyances of lots and rights of burial are expressly confirmed. But it is apparent from the considerations heretofore expressed, that this is not property which is held exclusively for purposes strictly public. The city of Boston is possessed of much other property which in a certain sense and to a certain extent is held for the benefit of the public, but in other respects is held more like the property of a private corporation. Notably among these may be mentioned its system of water works, its system of parks, its market, its hospital, and its library. In establishing all of these, the city has not acted strictly as an agent of the State government, for the accomplishment of general public or political purposes, but rather with special reference to the benefit of its own inhabitants. If its cemetery is under legislative control, so that a transfer of it without compensation can be required, it is not easy to see why the other properties mentioned are not also; and all the other cities and towns which own cemeteries or other property of the kinds mentioned might be under a similar liability.

In view of all these considerations, the conclusion to which we have come is that the cemetery falls within the class of property which the city owns in its private or proprietary character, as a private corporation might own it, and that its ownership is protected under the Constitutions of Massachusetts and of the United States so that the Legislature has no power to require its transfer without compensation. Const. of Mass., Dec. of Rights, Art. X. Const. of U. S., Fourteenth Amendment.

In judging of the validity of the particular statute under con-

sideration, St. 1889, c. 265, there are other reasons leading to the same result. The first is, that the duties of the city in respect to providing a burial place for the poor and for persons dying within its limits are not taken away. The city is still bound to provide one or more suitable places for the interment of persons dying within its limits; Pub. Sts. c. 82, § 9 ; and it is still bound to bury its paupers and indigent strangers. Pub. Sts. c. 84, §§ 14, 17. If this cemetery should be conveyed away, under the provisions of St. 1889, c. 265, the city would be bound to provide another. Certainly the mere continuance of the city's right to bury in a limited portion of the cemetery such persons as the law requires it to bury is not a provision adequate to meet the requirement of Pub. Sts. c. 82, § 9, and by the report of facts the portion referred to is not likely to suffice even for the burial of paupers for any great length of time. The city is bound to provide a suitable place for the interment of persons dying within its limits; not poor persons only, but all persons; and the burial of the dead in ground not sanctioned by the city authorities is strictly forbidden. So far as we know, it has never been held that the Legislature may require a city or town, without compensation, to transfer property which it has bought in order to enable it to discharge its statutory obligations, while at the same time its duties and obligations continue to rest upon it. On the other hand, it is justly assumed that, if the property is to be transferred, the duties will be transferred also. *Rawson* v. *Spencer,* 113 Mass. 40. *Commonwealth* v. *Plaisted,* 148 Mass. 375, 386. *Whitney* v. *Stow,* 111 Mass. 368. *Mayor, &c. of Baltimore* v. *State,* 15 Md. 376. But the duty of burying paupers, and of providing a place for the interment of all persons dying in Boston, is not imposed upon the petitioner. The duties of the city, and the duties of the petitioner under St. 1889, c. 265, are not the same.

Moreover, the legislative power over municipal property, when it exists, does not extend so far as to enable the Legislature to require a transfer without compensation to a private person or private corporation. The control which the Legislature may exercise is limited; it must act by public agencies and for public uses exclusively. If the city has purchased property for purposes which are strictly and purely public, as a mere instrumentality

of the State, such property is so far subject to the control of the Legislature that other instrumentalities of the State may be substituted for its management and care; but even the State itself has no power to require the city to transfer the title from public to private ownership.   Upon the division of counties, towns, school districts, public property with the public duty connected with it is often transferred from one public corporation to another public corporation.   But it was never heard of that the Legislature could require the city without compensation to transfer its city hall to a railroad corporation, to be used for a railway station, merely because the latter corporation has a charter from the Legislature, and owes certain duties to the public.

It is contended in behalf of the petitioner that it is a public corporation, wholly under the control of the Legislature.   But it is an error to suppose that a corporation becomes a public one merely by receiving a charter from the Legislature, by owing certain duties to the public, and by being subject to rules and regulations established in the exercise of the police power.  There is nothing in the case cited — *Woodlawn Cemetery* v. *Everett*, 118 Mass. 354 — to show that the Woodlawn Cemetery was regarded as a public corporation.   It clearly was not so.   It was said to be subject to the police power, like other cemetery corporations.   *Commonwealth* v. *Fahey*, 5 Cush. 408.   But liability to the exercise of the police power rests on different considerations, and that power does not extend so far as to include a right to require the transfer of property to another person without compensation.   The distinction between public and private corporations is well marked and clear.   Public corporations are governmental and political, like counties, cities, towns, school districts, — mere departments of the government, established by the Legislature, and modified, and destroyed, without their own consent.   Private corporations are formed by the voluntary agreement of their members, and cannot be established without the consent of the corporators.   Public corporations, as has been seen, may to some extent in relation to the ownership of property partake of the character of private corporations; and, on the other hand, many private corporations are charged with some duties and obligations to the public, as in the case of railroad

telegraph, canal, bridge, gas, and water companies. *Lumbard*
v. *Stearns*, 4 Cush. 60.     *Worcester* v. *Western Railroad*, 4 Met.
564.   *Commonwealth* v. *Smith*, 10 Allen, 448, 455.   But the gen-
eral line of distinction between the two classes of corporations is
clear.   *Linehan* v. *Cambridge*, 109 Mass. 212.   *Rawson* v. *Spen-
cer*, 113 Mass. 40, 45.     Morawetz on Corp. §§ 3, 24, 1114.
2 Kent Com. 275.   1 Dillon, Mun. Corp. (4th ed.) §§ 19, 22, 44,
54, 56.   Angell & Ames on Corp. §§ 14, 30, *et seq.*   *University
of Maryland* v. *Williams*, 9 Gill & J. 365, 397.     *Ten Eyck* v.
*Delaware & Raritan Canal Co.* 3 Harr. (N. J.) 200.   *Hanson* v.
*Vernon*, 27 Iowa, 28, 53.   *In re Deansville Cemetery Association*,
66 N. Y. 569.

An examination of the provisions of St. 1889, c. 265, leaves
no doubt that the petitioner falls within the class of private cor-
porations.   Its corporate members are such of the proprietors of
burial lots in the existing cemetery as shall accept the act and
notify the clerk of the corporation of such acceptance.   Member-
ship is wholly voluntary, and in point of fact only about one per-
son out of eight who were entitled to do so became members.
The corporation is to be subject to all the provisions of the Pub.
Sts. c. 82, so far as they can be applied thereto, and except so far
as inconsistent with St. 1889, c. 265.   Chapter 82 of the Public
Statutes relates mostly to private cemetery companies, which may
be organized by any ten or more persons.   *Jenkins* v. *Andover*,
103 Mass. 94, 104.   Such private cemetery corporation may lay
out its real estate into lots, and upon such terms, conditions, and
regulations as it shall prescribe may grant and convey the ex-
clusive right of burial, etc.   There is nothing in St. 1889, c. 265,
limiting this right, unless in § 5, providing that the city shall
continue to have the right of burial, in a certain prescribed por-
tion of the cemetery, of persons for whose burial it is or may be
bound by law to provide, viz. paupers and indigent strangers.
Subject to this, the petitioner may sell all the remaining lots, as
fast as it can, to all applicants.   It is true, under Pub. Sts. c. 82,
§ 2, it cannot make dividends from the proceeds of sales ; but the
Proprietors of the Cemetery at Mount Auburn, and many other
private cemetery corporations, are under the like restriction.   If
the city retains the ownership, it may devote the proceeds of
sales of lots, after providing for the suitable maintenance of the

cemetery, towards the purchase of a new burial place for its inhabitants when occasion may require. If the petitioner owns it, the city will lose that advantage. No duty to the public is imposed upon the petitioner by the terms of the statute, unless it is contained in the words in § 4 of St. 1889, c. 265, " to be held by said corporation, so far as consistent herewith, for the same uses and purposes, and charged with the same duties, trusts, and liabilities for and subject to which the same are now held by said city"; and the further words, " and the said corporation shall have in respect of said cemetery all rights, powers, and privileges, and be subject to all duties, obligations, and liabilities, now had or sustained by said city in respect thereof." What these duties towards the inhabitants of Boston are, it may be difficult to say. Certainly there appears to be nothing binding the corporation to give any preference to inhabitants of Boston in the sale of burial rights, or to prevent a substantial increase in the prices of such burial rights, at the will of the corporation. In short, there is nothing in the act to secure to the inhabitants of Boston those privileges in respect to burial rights which they might properly expect, even if they could not legally demand the same, from the city itself. There is therefore no ground on which the petitioner can be said in any just sense to be a public corporation, and its duties to the inhabitants of Boston are at best but vague and shadowy.

The city further urges that the obligation of the contracts into which it has entered with purchasers of burial rights, for the perpetual care of their lots, would be impaired by the provisions of St. 1889, c. 265. Since, for the reasons already given, we are of opinion that the statute was beyond the power of the Legislature, it is not necessary to consider this ground of objection to its validity.

*Petition dismissed.*