SCOTT COUNTY et al., Appellants, v. RAY E. JOHNSON et al., Appellees.

No. 38914.

DECEMBER 14, 1928.

REHEARING DENIED NOVEMBER 22, 1929.

214

*Bush & Bush,* for appellants.

*John Fletcher,* Attorney-general, *Maxwell A. O'Brien* and *Earl F. Wisdom,* Assistant Attorney-generals, *John Weir,* and *Bollinger & Block,* for Ray E. Johnson and Frank Reddy, appellees.

*Lane & Waterman* and *Albert W. Hamann,* for Home Savings Bank, Bettendorf Savings Bank, and Donahue Savings Bank, appellees.

*Lane & Waterman,* for American Commercial & Savings Bank, appellee.

*Jebens & Butenschoen,* for Northwest Davenport Savings Bank, appellee.

EVANS, J.—I. The avowed purpose of the suit is to challenge the constitutionality of the so-called Brookhart-Lovrien Act, Chapter 173, Acts of the Forty-first General Assembly. For the sake of brevity, the legislation thus assailed will be referred to as the Act.

We have no specific procedure for litigating such question in an abstract or declaratory sense. Such question may be litigated concretely by any litigant who shows an infringement of  his vested rights by the operation of such alleged unconstitutional statute. Before he can be heard to challenge the constitutionality of the legislation, it is prerequisite that he establish in himself the claimed right which is alleged to be infringed.

The plaintiff brings its action as the alleged owner of certain public funds, the diversion of which is proposed by the defendants, pursuant to the statute. The defendant denies the status of the plaintiff as such owner. This question calls for our first consideration.

Before and at the time of the enactment of Chapter 173, Acts of the Forty-first General Assembly, the following sections of the statute were in force as existing law: Sections 7404, 5651, 5548, and 4319 of the Code of 1924. We set them forth herein:

"7404. *Deposits by county treasurer.* The county treasurer shall, with the approval of the board of supervisors as to place of deposit, by resolution entered of record, deposit state, county, or other funds in any bank or banks in the state to an amount fixed by such resolution at interest at the rate of at least two and one-half per cent per annum on ninety per cent of the daily balances payable at the end of each month, all of which shall accrue to the benefit of the general county fund."

"5651. *Deposit of funds.* Treasurers of cities and towns shall, with the approval of the council as to place and amount of deposit, by resolution entered of record, deposit city and town funds in any bank or banks in the city or town to which the funds belong, at interest at the rate of not less than two and one-half per cent per annum on ninety per cent of the daily balances, payable at the end of each month. Interest shall accrue to the benefit of the general fund."

"5548. *Deposit of funds.* He shall deposit all funds coming into his hands by virtue of his office, in a bank conveniently located, each deposit to be in the name of his township and at a rate of interest not less than two and one-half per cent per annum on ninety per cent of the daily balances, payable at the end

of each month, which interest shall accrue to the benefit of the township road fund.''

''4319. *Deposit of funds.* It is hereby made the duty of the treasurer of each school corporation to deposit all funds in his hands as such treasurer in some bank or banks in the state at interest at the rate of at least two per cent per annum on ninety per cent of the daily balances payable at the end of each month, all of which shall accrue to the benefit of the general fund of such school corporation; but before such deposit is made, such bank shall file a bond with sureties to be approved by the treasurer and the board of directors of such corporation in double the amount deposited, conditioned to hold the school corporation harmless from all loss by reason of such deposit or deposits; provided that in cases where an approved surety company's bond is furnished, said bond may be accepted in an amount equal to ten per cent more than the amount deposited. Said bond shall be filed with the president of the school board and action may be brought thereon either by the treasurer or the school corporation as the board may elect.''

The act under challenge is in part as follows:

''An act to create a state sinking fund for public deposits and to provide a method for the payment of public funds deposited as provided by law, in banks which have since become insolvent; to provide a manner of collecting the sinking fund and of making disbursements therefrom; to provide for the subrogation of the treasurer of state to the rights of the holders of deposits of public funds in the hands of receivers; to increase the powers of the executive council, town and city councils, boards of school directors and of township trustees, relating to deposits of public funds; to relieve public officers from liability on account of the loss of public funds deposited in legal depositories; to amend, revise, and codify Sections one hundred thirty-nine (139), forty-three hundred nineteen (4319) and fifty-five hundred forty-seven (5547) of the Code, 1924, relating to depository bonds, and to repeal Sections seventy-four hundred five (7405), fifty-six hundred fifty-two (5652), and fifty-five hundred fifty (5550) of the Code, 1924, relating to depository bonds.

''*Be it Enacted by the General Assembly of the State of Iowa:*

''Section 1. There is hereby created in the office of the

treasurer of state a separate fund to be known as the state sinking fund for public deposits and the purpose of said fund shall be to secure the payment of their deposits to state, county, township, municipal, and school corporations having public funds deposited in any bank in this state, when such deposits have been made by authority of and in conformity with the direction of the local governing council or board which is by law charged with the duty of selecting depository banks for said funds. Said funds shall be collected by the treasurer of state as needed and shall be held by him and deposited as other public funds, and at no time shall any call be sent out for the collection of such funds or diversion of interest be commenced when there is a balance on hand in such fund of more than five hundred thousand dollars ($500,000.00). All above a necessary working balance shall be kept invested in United States government bonds under the direction of the executive council.

"Sec. 2. All interest hereafter collected by the state of Iowa from depositories of state funds as provided in Section one hundred forty (140) of the Code, 1924, all interest hereafter collected from depositories of the county funds by county treasurers as provided in Section seventy-four hundred four (7404) of the Code, 1924, all interest hereafter collected by city treasurers as provided in Section fifty-six hundred fifty-one (5651) of the Code, 1924, all interest hereafter collected by school treasurers as provided in Section forty-three hundred nineteen (4319) of the Code, 1924, all interest collected by township clerks under Section fifty-five hundred forty-eight (5548) of the Code, 1924, and any other interest hereafter collected from depositories of public funds, as provided by statute, is hereby diverted from the general fund or township road fund, as the case may be, and shall be paid into the state treasury and kept in the fund created by this act, or so much thereof as shall be ordered so paid by the treasurer of state. No part of said interest above two and one-half per cent (2½ per cent) per annum shall be so diverted or collected for said sinking fund."

Prior to the year 1909, there was no statutory provision requiring the payment of interest by depositories of public funds. The sections of the statute quoted above were enacted at different times on and after the year 1909. In the ensuing years, millions

of dollars have been collected into the public treasuries pursuant thereto. By such enactments the legislature created a source of revenue which was nonexistent before. By such statutes no effort was made to allot to particular funds the interest accruing on the respective deposits of such funds. All interest collected on county deposits was allotted to the "general fund" of the county. All interest collected on city deposits was allotted to the "general fund" of the city. All interest collected on deposits of school corporations was allotted to the "general fund" of such corporation. All interest collected on township deposits was allotted to the "road fund" of the township. Under the act complained of, all such allotments were diverted into the state sinking fund. The plaintiff challenges the power of the legislature to divert *its* allotments from its "general fund" into the state sinking fund. Does the plaintiff, as a county, have a proprietary right to demand as its own property all interest to be collected upon county deposits under the foregoing statutes? And is such right superior, on constitutional grounds, to the power of the legislature to enact otherwise? It may be conceded, only for the purpose of the argument, that, prior and up to the enactment of the act in question, all interest collected on county deposits became the property of the plaintiff, because such was the effect of the statutory allotment to its "general fund." Section 7404. But such ownership rested upon the legislative will. It became the owner of such property only because the legislature so enacted. Such enactment was necessarily subject to change by future enactments. Unless, therefore, the plaintiff can establish its ownership of the property on grounds other than legislative enactment, it is in no position to challenge the power of the legislature to change such enactment. To meet this argument, the plaintiff contends that interest is a mere increment of the principal, and that it necessarily inures to the benefit of the owner of the principal. If it be assumed, without being conceded, that the plaintiff is, as a matter of law, the owner of the principal deposit, yet such ownership emanates from legislation. Though it is ordinarily and presumptively true that the interest follows the principal into the hands of the same owner, yet this is not so of legal necessity. Interest may by contract be legally segregated from the principal. A donor, for instance, may donate the principal to his donee, and reserve the accruing interest to him-

self. The segregation which may legally be accomplished by contract may likewise be accomplished by legislation. The legislature having opened up this new source of revenue, the state necessarily has the incidental power to receive its fruit in such manner as the legislature shall provide. If, in the first instance, the legislature had power to allot the interest to the plaintiff, did it have less power to allot it otherwise? If, in the first instance, it had allotted all the revenue of this new source to the "school fund," could the plaintiff have challenged the legality of such enactment? If the legislature could have done so in its first legislation, is its power any less to do so by later legislation? The plaintiff is in no position to complain of the diversion of "interest" from the purposes for which the principal tax was collected. The allotment of such interest to the plaintiff's "general fund" was itself a diversion, in that sense. The county has a score or more of particular funds for the benefit of which specific taxes are collected. The interest accrued and collected on principal sums belonging to these various "funds" was not allotted to these separate funds, but was all allotted to plaintiff's "general fund," whereby it became subject to expenditure by the plaintiff for miscellaneous purposes, at the discretion of its supervisors. If *diversion* were beyond the power of the legislature, then plaintiff's original statutory title must fail *pro tanto*.

For many years before the enactment of the challenged act, the plaintiff had received into its "general fund" and expended therefrom, pursuant to Section 7404, large sums of interest which had not accrued upon the *principal* of such "general fund." Its right to retain the sums thus received and expended by it is not challenged by the later legislation. The challenged act simply operates upon the after accruals of interest. It takes nothing away from the plaintiff. It simply ceases to extend the former benefits to plaintiff's "general fund," and now allots them to the state sinking fund. This feature of plaintiff's argument, therefore, is as hostile to the plaintiff's own right to the benefits originally accepted by it as it is to the validity of the challenged act. We hold, therefore, that plaintiff's alleged ownership of the "interest" is such only as is conferred upon it by legislation, and that, as to future benefits, it is necessarily subject to later legislation. There can be no reasonable doubt of the constitutional power of the legislature to withhold from the plaintiff for

the future the benefits formerly conferred upon it, and to make other provisions for the custody of the moneys received as interest. And this is so even though it should be found that the proposed future *use* of the money would be unconstitutional. Inasmuch as the plaintiff has been legally divested of the right to future accruals, then it cannot, in any event, have any legal interest or concern in the question whether the proposed *use* of such accruals be unconstitutional or not.

The act in question was a legislative scheme to create a source of public revenue by utilizing a by-product. Prior thereto, millions of public funds were held in the custody of official treasurers, who usually deposited them for safe-keeping in the various banks of the state. The current use of these deposits had large inherent value, the benefit of which accrued wholly to the depositary banks. So far as the public was concerned, such value was allowed to become mere waste. The scheme was to utilize this waste and to convert it into profit. The official treasurers were shorn of their power of discretion, and were likewise released from the attendant responsibility as custodians. The sovereign state exerted its power over the deposits and exacted compensation therefor. The scheme thus adopted carried both the promise of profit and the risk of attendant loss. The scheme purported to set the one against the other. It contemplated a subtraction of losses before an addition of profits. Profit and loss, benefit and burden,—these are recognized balances of the law, and are the Siamese twins of all private enterprise. Profit is yoked with loss, and benefit is saddled with the burden. If the loss absorbs the profit, then there is no profit. If loss exceeds the profit, what then? Whether the state may at all embark upon financial seas and take any risk of loss for a prospect of profit is a question beyond the scope of our consideration herein. The essence of appellant's complaint at this point is that the profits accruing in one county have been devoted to the losses accruing in another, and that this results in the appropriation of the property of one to the payment of the debts of another. This contention assumes that the scheme of the Act is divisible into 99 parts. The Act does not so purport. It purports to set forth *one* scheme, and not 99. If the legislature had power to enact separate schemes for each county, it had equal power to enact one scheme for all.

Sufficient to say that, from whatever point of view we consider the appellant's complaint, it fails to sustain its vital allegation of ownership of the funds alleged to have been wrongfully diverted.

II. There is another important consideration which emphasizes the force of the foregoing discussion. The plaintiff is one of the counties of the state. True, it is a body corporate,  and may sue or be sued as such. But this attribute is conferred upon it by legislation, and not otherwise. It is a subdivision of the state, and owes its creation to the state, and is subject at all times to legislative control. True, a municipal corporation may have a dual capacity, and in addition to its public capacity, may acquire and exercise proprietary rights which are in the nature of private rights. A city acquiring and operating a public utility might be so classified. But as applied to the political subdivisions of the state, such dual capacity is exceptional, rather than usual. In the case at bar, no proprietary right is involved. All of plaintiff's property is acquired by the exercise of governmental functions. All its revenues are public revenues, derived through the power of taxation conferred upon the county by the legislature. All its rights, privileges, and power are likewise governmental, and are conferred upon it by legislation; none of them inhere in it independent of such legislation. Its rights herein are measured by the statute; and none are superior to statutory control. It is, therefore, the generally accepted rule that a political subdivision of the state, as such, may not invoke the constitutional inhibition against legislative impairment of vested rights, because it has no vested rights, within the meaning of the Constitution. Authorities will be referred to later.

If Section 7404 should be deemed to create in the plaintiff a vested right, entitling it to the protection of the constitutional inhibition, then, for the same reason, Section 4319 should be deemed to create a like vested right in a school corporation. We have held definitely that a school corporation cannot challenge the constitutionality of a legislative act. *Waddell v. Board of Directors*, 190 Iowa 400. We have held also indirectly that a county is under the same disability. *McSurely v. McGrew*, 140 Iowa 163. And later, we have held directly to such effect. *Iowa Life Ins. Co. v. Board of Supervisors*, 190 Iowa 777. These au-

thorities are quite conclusive against the plaintiff's capacity to challenge this legislation. The doctrine has abundant support in other jurisdictions.

III. We incorporate in this division a few excerpts from the authorities in support of our foregoing discussion.

In *McSurely v. McGrew*, 140 Iowa 163, the power of the legislature to release a county treasurer from liability on his bond was challenged. We sustained such power, and said:

"This is predicated upon the thought that the legislature has plenary power over counties and their officers; that no contract rights were impaired, and no vested rights taken away. If nothing but private rights were involved, it is manifest that the act could not be sustained. But the matters involved here are public, and the county of Van Buren is the real party in interest. A county, while a body corporate under our law, is a subdivision of the state, created for administrative and other public purposes, owes its creation to the state, and is subject at all times to legislative control and change. No citizen has any vested right in or to its revenues. These may be changed, diverted to other uses, or taken away, and no one may complain on the theory that his interests have been affected or any contract rights destroyed. The legislature might have permitted the deposit of county funds in banks and absolved the county officers from any liability on account of such deposits. Neither the county nor any of the inhabitants thereof had any vested interest in the funds coming into the county treasurer's hands. * * * The legislature undoubtedly had power, in the first instance, to absolve its county treasurer from liability when he deposited money in solvent banks; and, as no contract rights are involved, save as the statute created such rights, there seems to be no constitutional objection to passing a retroactive law which would operate upon past transactions. *State ex rel. Bulkeley v. Williams,* 68 Conn. 131 (35 Atl. 24, 421, 48 L. R. A. 478). The bond in suit, while a contract, was entered into between a dependent government and an officer thereof. The duties of such officer were prescribed by statute, and not by the terms of the bond, and these duties might at any time be changed without violating the terms of that instrument. Even after suit brought, the law may be changed, for there is no vested right to a particular decision. *Windsor v. Des*

*Moines,* 110 Iowa 175. See, as sustaining these views, *Beecher v. Board of Supervisors,* 50 Iowa 538. That the legislature has plenary power over all municipal corporations and their officers is too well settled to admit of argument. And it is just as well settled that the same power exists as to public revenues. An interesting and instructive case on this subject is found in 44 Ind. 524, entitled *Lucas v. Board of Commissioners.* The Supreme Court of Indiana held that an act of the legislature, taking away from counties stock issued to them by a private corporation, in consideration of the proceeds of a certain tax, and giving the same to the taxpayers who had paid the tax, was not unconstitutional. This decision was affirmed by the Supreme Court of the United States upon appeal. See *Board of Com'rs. of Tippecanoe Co. v. Lucas et al.,* 93 U. S. 108 (23 L. Ed. 822). These cases contain a careful review of the authorities upon the subject, and are decisive of one of the main questions involved. See, also, Abbott on Municipal Corporations, Sections 22, 84, 88, and cases cited. Of course, under the guise of legislative control, a private citizen cannot be deprived of any of his rights against a municipal corporation. They are as sacred as if they existed against a private one. But the municipality itself cannot complain of any act of the legislature diminishing its revenues, amending its charter, or even dissolving it entirely. It may, of course, acquire certain proprietary or private rights, not held by the public in general, of which it cannot be deprived. * * * But this rule, or rather exception to the general rule, seems to apply only to property reduced to possession, or held in trust for the inhabitants of the territory as distinct from the people as a whole. It does not apply to executory contracts, or to provisions concerning funds or revenues. City, county, and township funds are subject to legislative control.''

In *Waddell v. Board of Directors,* 190 Iowa 400, we had before us the question whether the legislature could direct the distribution of real estate held by a school corporation under warranty deed. It was contended that later legislation impaired the vested right of the school corporation under such warranty deed. We said:

''The argument that we are governed now by the statute in force when the school sites were acquired is, on its face, a plausi-

ble one. Likewise, the argument that, the rights of the parties having been settled and vested by the warranty deeds, no subsequent legislation could impair such vested rights, because of constitutional inhibition. But this loses sight of a fundamental fact in this case. The defendant is a school corporation. It is a legislative creation. It is not organized for profit. It is an arm of the state, a part of its political organization. It is not a 'person,' within the meaning of any bill of rights or constitutional limitation. It has no rights, no functions, no capacity, except such as are conferred upon it by the legislature. The legislative power is plenary. It may prescribe its form of organization and its functions today, and it may change them tomorrow. It may confer or withhold power to take title to real estate. Conferring such power, it may qualify it, both as to the title and tenure of the real estate. It may dissolve the corporation at any time, and may direct the disposition of its property. If any rights arose out of any conveyance at the time thereof to any *person* other than the district township, such rights could not be impaired by subsequent legislation. As to the rights of the school corporation, these *could* be impaired and diminished by subsequent legislation. So far as disclosed, no right arose to anybody out of the conveyances, except to the school corporation. As to the parties who might ultimately become entitled to a reversion under the provisions of the statute then existing, no right then vested. The legislature could thereafter have repealed the provision for reversion, without violating the rights of anyone. It could have again enacted different provisions pertaining to reversion, without violating the rights of anyone. In other words, no one then had a vested right in the future operation of the statute. When the rights of these claimants finally vested by nonuser, they took even then by statutory grace, and not by any right outside of the statute. Inasmuch, therefore, as no vested rights were involved, and inasmuch as the power of the legislature over the school corporation was plenary and continuing, it has precisely the same right, as to the corporation, to enact amendatory legislation as it had to enact the original legislation. Necessarily, the school corporation became at once amenable to the new legislation. * * * The statute being enacted, the rights of these claimants arise under it, and not outside of it. It does not purport to determine or impair existing rights of any person. It is simply the exercise

of the power of the legislature over the school corporation and over its property. Granting that the corporation took an absolute fee-simple title, yet this would not thereby carry such title beyond the power of the legislature; so that, whatever the method of acquisition, and whatever the nature and extent of the title acquired by the school corporation, the decisive fact remains that it never gets beyond the power of the legislature to disqualify it from holding title to schoolhouse sites after school uses have ceased.''

In *Iowa Life Ins. Co. v. Board of Supervisors,* 190 Iowa 777, we said:

''This brings us to a crucial point which has been inadvertently overlooked by the parties. The attack upon these sections of the statute is made by the defendant county. It is not a taxpayer. It has never suffered discrimination by the operation of either or both of these sections. It never can suffer discrimination thereby. It is a mere collector of taxes thereunder, and perhaps a beneficiary thereof. The only power conferred upon it to collect or to receive taxes is conferred upon it by the very sections under attack and their co-ordinate sections. What does it avail the defendant to show the variance of the statutes as a ground of unconstitutionality, and thereby to destroy its own power to collect taxes at all? In other words, what standing has it to denounce an act of the legislature as unconstitutional, by the operation of which it has never been hurt, and never can be? The rule is well settled that a litigant may not attack a statute as unconstitutional unless he can show that its enforcement would be an infringement upon his rights. The constitutionality of a statute cannot be questioned by one who is not prejudiced by its enforcement. *Brown v. Smart,* 145 U. S. 454; *Walsh v. Columbus H. V. & A. R. Co.,* 176 U. S 469. The authorities on this proposition are abundant and uniform. A collation of them may be found in 6 Ruling Case Law, under Sections 87 and 88 (page 90). Based upon these authorities, the text states the rule as follows:

'87. Before a law can be attacked by any person on the ground that it is unconstitutional, he must show that he has an interest in the question, in that the enforcement of the law would be an infringement on his rights. One who is not prejudiced by

the enforcement of an act of the legislature cannot question its constitutionality or obtain a decision as to its invalidity on the ground that it impairs the rights of others. It has been said that courts cannot pass on the question of the constitutionality of a statute abstractly, but only as it applies and is sought to be enforced in the. government of a particular case before the court; for the power to revoke or repeal a statute is not judicial in its character. * * *

'88. Where the class which includes the party complaining is in no wise prejudiced, the general rule is that it is immaterial whether a law discriminates against other classes, or denies to other persons equal protection of the laws.'

The conclusion is unavoidable that the defendant county has no standing to attack the constitutionality of these statutes. We have no occasion, therefore, to consider the question of statutory classification which is presented to us in the briefs.''

As against the foregoing, the appellant relies upon such cases as *State ex rel. White v. Barker,* 116 Iowa 96; *Board of Com. v. Lucas,* 93 U. S. 108; *State ex rel. Bell v. Cummings,* 130 Tenn. 566 (L. R. A. 1915D 274). We find no inconsistency between the pronouncement of these cited cases and those which we have quoted above. These latter cases deal with the distinction between proprietary rights of property and governmental rights of property. In support of this statement, we incorporate here the very excerpts set forth and relied on in the briefs presented by appellant.

In *State ex rel. White v. Barker,* 116 Iowa 96, we said:

''We have already called attention to the dual nature of municipal corporations, and have discovered that *with respect to private and proprietary rights and interests they are entitled to constitutional protection.* * * * If the city were a mere private corporation, it would need no argument to show that the legislature could not take the management of its property out of the hands of its officers and directors, and place it in the custody and control of officials, even if they be stockholders, selected by persons who had no interest in the corporate entity, and who were in no manner responsible to those interested in the welfare of the organization. Such divestiture of property, or, what is the same thing, of its management and control, would be unconstitu-

tional and void. The same rules have been applied to property held by a municipal corporation in its private and proprietary capacity. * * * [Citing many cases.] This view appears to be based on the soundest of reasons, and to be supported by the weight of authority.''

In *Board of Com. v. Lucas*, 93 U. S. 108, the court said:

''But property derived by them from *other sources* [than taxation] is often held, by the terms of its grant, *for special uses, from which it cannot be diverted by the legislature.* In such cases, the property is protected by all the guards against legislative interference possessed by individuals and private corporations for their property.''

In *State ex rel. Bell v. Cummings*, 130 Tenn. 566, the court said:

''The distinction thus taken by Mr. Justice Field between funds acquired and held by a county in the exercise of the governmental function of taxation and funds or property held in its quasi private or proprietary right is maintained in many cases. *Worcester v. Worcester Consol. Street R. Co.*, 196 U. S. 539, 49 L. Ed. 591, 25 Sup. Ct. 327; *Mt. Hope Cemetery v. Boston*, 158 Mass. 509, 35 Am. St. Rep. 515, 33 N. E. 695; 1 McQuillin Mun. Corp., Sec. 230-2. The first is declared not entitled to 'constitutional protection,' while the latter is so safeguarded, and *may not be diverted by legislative act.*''

The foregoing is sufficient indication of the state of the authorities on the question now under consideration.

IV. One ground of challenge to the validity of the Act is that it was not legally passed by the legislature, for want of constitutional formalities. This ground of challenge, if tenable, would be available to the appellant as tending to support its ownership of the funds, under the provisions of Section 7404. This contention, however, is predicated, as we think, upon an erroneous conception of the legislative record. A careful examination of such record, as it has been laid before us in the abstracts, satisfies us that the point made is not tenable. That due formality was observed in the enactment of the Act is not, in our judgment, fairly debatable. A detailed discussion of the

pros and cons of the question would require a voluminous draft upon the legislative records, and would become too prolix to *require* a discussion thereof in this opinion.

V. Many other grounds of challenge are specified and amplified in appellant's briefs. These have given to the briefs a much broader scope than is indicated herein. Nor would we minimize the great industry and signal ability evinced by such briefs in the discussion of the manifold phases of the question of constitutionality. But, in view of our foregoing conclusion that the appellant fails to show any vested right in the subject-matter of the controversy, the questions thus discussed are reduced to an abstraction, so far as appellant is concerned. A volunteer discussion thereof by us could adjudicate nothing. A pronouncement thereon could only be dictum. As already indicated, we have no power to enter declaratory judgments.

The sum of our conclusion is that Chapter 173, Acts of the Forty-first General Assembly, is so related to Section 7404 as to be amendatory thereof. The amendment operated as a repeal of a part of the original section. The appellant has necessarily built its case upon the original Section 7404, as the necessary source of its title to the funds. This original section is its standing ground for the purpose of its attack upon the later amending legislation. The power to repeal was exactly equal to the power of original enactment. By way of illustration, let it be supposed that the last clause of Section 7404, as originally enacted, had been as follows: "* * * all of which shall be paid into the state treasury, and shall accrue to the benefit of its general fund." Could a county assert any invasion of its vested rights by legislation in such form? Clearly not.

If it had been further true that such enactment had purported to devote the funds thus acquired by the state to uses not permissible by the Constitution, even so, it could have been no part of the function of a county, whose own property right was not invaded, to challenge the constitutionality of such legislation.

The reasons herein indicated are, in our judgment, con-

clusive in support of the order of dismissal entered in the district court.

Such order is, accordingly,—*Affirmed.*

All the justices concur.