## LIABILITY TO TAXATION OF RAILWAY TERMINALS OWNED BY A MUNICIPALITY.

Superior Court of Cincinnati.

TRUSTEES OF THE CINCINNATI SOUTHERN RAILWAY V. CHARLES E. ROTH, TREASURER OF HAMILTON COUNTY, AND ROBERT E. EDMONDSON, AUDITOR OF HAMILTON COUNTY.

Decided, February 12, 1913.

*Taxation—Municipally Owned Property Not Used for Any Governmental Function—Properly Placed on the Tax Duplicate—Railway Viaduct and Terminals Owned by the City of Cincinnati—Held Subject to Taxation—Section 5399.*

1. There is no exemption from taxation by implication in Ohio. Article XII, Section 2, of the Constitution does not create exemptions; it merely authorizes the General Assembly to exempt certain kinds of property. Therefore no exemptions can exist unless found in the statutes in plain, unambiguous words.

2. The public property which is exempt from taxation by the laws of Ohio does not include all municipally owned property, but only such public property as is employed in the exercise of some governmental function.

3. A railroad owned and operated by a municipality is not employed by it in the exercise of any purely governmental function, but in the exercise of its proprietary or private functions, and is not exempt from taxation by the state.

4. Section 5399 of the General Code does not prevent the county auditor from placing upon the tax duplicate municipally owned real estate omitted therefrom during previous years.

5. The act of May 10, 1910 (101 O. L., 399), creating a tax commission, was not intended to give to such commission any control over the property of municipal corporations.

*John R. Sayler, W. T. Porter* and *Harmon, Colston, Goldsmith & Hoadly,* for plaintiffs.

*Thomas L. Pogue,* Prosecuting Attorney, and *John V. Campbell* and *Charles A. Groom,* Assistant Prosecuting Attorneys, contra.

OPPENHEIMER, J.

Plaintiffs allege that they are a board of trustees appointed under the act of May 4, 1869, and authorized to construct and maintain a railway from Cincinnati to Chattanooga, Tenn.; that under the authority thus conferred upon them they have constructed such railway and leased it to the Cincinnati, New Orleans & Texas Pacific Railway Company, by which it is now operated; that by the act of April 23, 1898, and the vote of the qualified electors of Cincinnati, they were authorized to borrow a sum not to exceed $2,500,000 for the purpose of providing terminal facilities and permanent betterments for said railway; that they have, in the exercise of this power, obtained property in Cincinnati by proper appropriation proceedings, and erected thereon a freight station costing more than a million and a half of dollars; that they have acquired other property for a right-of-way between the line of said road and said freight station, and have constructed a viaduct which they intend to connect with said freight station; that the tracks upon said right-of-way and viaduct have not yet been connected with the freight station, so that no portion thereof has been turned over to the Cincinnati, New Orleans & Pacific Railway Company, or come under the operation of its lease, but that when completed it will form a portion of the line of railway of the Cincinnati Southern Railway.

Plaintiffs further allege that the auditor of Hamilton county has certified to the treasurer taxes in the sum of $505.40 upon said right-of-way, being the last half of the taxes for the year 1910, payable in June, 1911; that he has likewise placed said viaduct upon the tax duplicate at a valuation of $96,000 for the year 1910, and $189,500 for the year 1911, and has entered the taxes thereon, amounting to $8,662.22, and certified them to the treasurer.

By amendment to this cause of action, plaintiffs further allege that in the performance of all these acts, they were merely acting as trustees, the sole beneficiary of their trust being the city of Cincinnati, and that the valuations placed upon said viaduct by said county auditor was the value of the unfinished viaduct.

The second cause of action reaffirms the preceding allegations, and asserts that the county auditor exceeded his authority in adding to the tax duplicate in the year 1911, property omitted therefrom prior to the year 1910.

The third cause of action likewise reaffirms the allegations of the first cause, and adds that even if the right-of-way and viaduct have passed, by operation of the aforementioned lease, to the C., N. O. & T. P. Ry. Co., the auditor may not fix the valuation of the property and enter it upon the duplicate, because such duty devolves exclusively upon the tax commission by virtue of the act of May 10, 1910 (101 O. L., 399).

To these several causes of action defendants have demurred. As to the first cause of action they contend that the property is taxable because it is not employed by the municipality in the performance of any governmental function; as to the second cause, that the act of May 31, 1911, does not prohibit the assessment and taxation of property for the year 1909; and as to the third cause, that the act of May 10, 1910, which created the tax commission, has no application to property owned by municipal corporations.

Taxes have been defined by Judge Cooley as "the enforced proportional contribution from persons and property, levied by the state by virtue of its sovereignty for the support of government and for all public needs" (Cooley, Taxation, p. 1). "The power of taxation," he says (p. 7), "is an incident of sovereignty, and is possessed by the government without being expressly conferred by the people. It is a legislative power; and when the people by their constitutions, create a department of government upon which they confer the power to make laws, the power of taxation is conferred as part of the more general power."

This is a recognition of the elementary proposition that the power of taxation is a necessary incident of sovereignty. Without such power, governments could not be maintained. It is inherent primarily in the people themselves, and is by them committed to and vested exclusively in the legislative body by virtue of the general grant of legislative power. Constitutional pro-

visions are merely limitations upon the exercise of this power, beyond which the Legislature is not permitted to go.

Not merely was this fundamental proposition recognized by those who urged upon the people the adoption of the Federal Constitution (Federalist, Nos. XXX to XXXV), but it was also clearly enunciated by that great expounder of the Constitution, Chief Justice Marshall, in the oft-cited case of *McCulloch* v. *Maryland*, 4 Wheaton, 316, 428:

"It is admitted that the power of taxing the people and their property is essential to the very existence of government, and may be legitimately exercised on the objects to which it is applicable, to the utmost extent to which the government may choose to carry it. The only security against the abuse of this power is found in the structure of the government itself. In imposing a tax the Legislature acts upon its constituents. This is in general a sufficient security against erroneous and oppressive taxation.

"The people of a state, therefore, give to their government a right of taxing themselves and their property, and as the exigencies of government can not be limited, they prescribe no limits to the exercise of this right, resting confidently on the interest of the legislator, and on the influence of the constituents over their representative, to guard them against its abuse. * * *

"It may be objected to this definition, that the power of taxation is not confined to the people and property of a state. It may be exercised upon every object brought within its jurisdiction.

"This is true. But to what source do we trace this right? It is obvious that it is an incident of sovereignty, and is coextensive with that to which it is an incident. All subjects over which the sovereign power of a state extends, are objects of taxation; but those over which it does not extend are, upon the soundest principles, exempt from taxation. This proposition may be almost pronounced self-evident."

These principles were substantially affirmed by the Supreme Court of this state in the early cases of *Bonsal* v. *Lebanon*, 19 Ohio, 418; *Scovill* v. *Cleveland*, 1 Ohio St., 127; and *Hill* v. *Higdon*, 5 Ohio St., 243. In the last mentioned case the court speaking through Chief Justice Ranney, said (p. 245):

"That (the power of taxation) was a power liable to abuse, and very often abused, was conceded; but, as the people had made a plenary delegation of authority, and had imposed no positive restrictions upon its exercise, it was thought to be clear that they relied for protection upon the wisdom and justice of the representative body, and the accountability of its members to them, rather than the restraining powers of the courts of law."

Again in the case of *Western Union Telegraph Company* v. *Mayer*, 28 Ohio St., 521, our Supreme Court has pertinently said (p. 533):

"The power of the state to collect taxes for public purposes, is an inherent and indispensable incident of sovereignty. Without it no civilized state could discharge its functions.

"This power would exist without a written constitution. The object of constitutional provisions is to regulate its exercise by such limitations and restrictions as will protect the people against unjust or arbitrary action of the governing power. * * * The Constitution (Article II, Section 1) provides, that 'the legislative power of the state shall be vested in the General Assembly.'

"The power to raise revenue for public purposes, being a legislative power, is thus expressly committed to the General Assembly. It is a grant of general power of taxation. Limitations and restrictions on its exercise are to be found in other provisions of that instrument, and in the Federal Constitution. Thus Article XII, which relates to taxation, is not, as seems to be supposed, a delegation of authority to raise revenue, but a limitation of that power as conferred by Article II, Section 1."

It is not necessary to multiply citations or to indulge in prolix explanations of this apparently undisputed principle of law, the disregard of which is, according to Mr. James Gray (Limitations of the Taxing Power, Section 534), "reckoned by historians among the chief causes of both the English and the American Revolutions."

We have seen that the constitutional limitation upon this general legislative power of taxation is found in Article XII, Section 2, of the Constitution. So far as it is pertinent to the question now at issue, it provides as follows:

"Laws shall be passed, taxing by a uniform rule, all moneys, credits, investments in bonds, stocks, joint stock companies, or otherwise; and also all real and personal property according to its true value in money,. excepting bonds of the state of Ohio, bonds of any· city, village, hamlet, county, or township in this state, and bonds issued in behalf of the public schools of Ohio and the means of instruction in connection therewith, which bonds shall be exempt from taxation; but burying grounds, public school-houses, houses used exclusively for public worship, institutions of purely public charity, public property used exclusively for any public purpose, and personal property, to an amount not exceeding in value two hundred dollars for each individual, may, by general laws, be exempt from taxation." * * *

It is manifest that this section is not self-executing. It does not tax property. But it is mandatory, and requires the General Assembly to pass laws in accordance with its provisions. It recognizes the existence of the power of taxation, granted to the legislative body·by virtue of Article II, Section 1, of the same instrument, and prescribes certain rules and limitations which must be observed in the exercise of that power. Nor does it create any exemptions, except as to certain classes of bonds; it merely authorizes the General Assembly, if it sees fit, to exempt by general laws, certain definitely enumerated kinds of property.

In pursuance of this constitutional requirement, the General Assembly has enacted Section 5328 of the General Code, which reads, in part:

"All real or personal property in this state, belonging to individuals or corporations, and all moneys, credits, investments in bonds, stocks, or otherwise, of persons residing in this state, shall be subject to taxation, except only such property as may be expressly exempted therefrom." * * *

And in the exercise of its constitutional authority to exempt certain property from taxation, the General Assembly has enacted Sections 5349 to 5365-1, inclusive, of the General Code. These sections specifically exempt public schoolhouses and houses used exclusively for public worship, graveyards, courthouses and jails, buildings and lands used exclusively for the accommodation or support of the poor, armory buildings, apparatus used for the

extinguishment of fires, market houses, public grounds, halls used exclusively for public purposes, water-works, and certain kinds of stocks and other property which do not now demand our attention.

We do not believe that argument or citation of authority will be necessary to show that the word "corporations," as used in Section 5328 of the General Code, heretofore quoted, includes municipal corporations. It is perfectly manifest that Article XII, Section 2, of the Constitution, authorizing the exemption of "public property used exclusively for any public purpose," necessarily implies the taxation, in the manner previously indicated, of all public property otherwise employed.

At this point it may be well to emphasize another proposition to which reference has heretofore been made, viz., that every presumption is in favor of the taxation of property, and every presumption against its exemption. He who alleges that certain property is exempt must sustain his position by cogent proof. As was said by our Supreme Court, in *Lee* v. *Sturgis*, 46 Ohio St., 153, 159 (quoting with approval from *Railway Co.* v. *Supervisors*, 93 U. S., 595):

"Where an exception or exemption is claimed, the intention of the General Assembly to except must be expressed in clear and unambiguous terms. 'The exemption must be shown indubitably to exist. At the outset every presumption is against it. A well founded doubt is fatal to the claim. It is only where the terms of the concession are too explicit to admit fairly of any other construction that the proposition can be supported.' Intent to confer immunity from taxation must be clear beyond a reasonable doubt, for, as in case of a claim of grant, nothing can be taken against the state by presumption or inference."

This doctrine has been repeatedly enunciated by the Supreme Court of Ohio, but we shall content ourselves with referring to *Cincinnati* v. *State*, 19 Ohio, 110, 115; *Lander* v. *Burke*, 65 Ohio St., 532, 542; *Watterson* v. *Halliday*, 77 Ohio St., 150, 171. And the same doctrine has found expression in *Providence Bank* v. *Billings*, 4 Pet., 514, 561; *St. Louis* v. *Railway Co.*, 210 U. S., 266, 273-4; *People* v. *Tax Commissioners*, 174 N. Y., 417, 448;

*Cooley, Constitutional Limitations,* 740, note 1; *Dillon, Municipal Corporations,* 5th Ed., Section 1401; 28 Cyc., 1687-8; 37 Cyc., 874-7.

We are now brought directly to a consideration of the first and most important question raised by defendant's demurrer: Is the property described in the petition exempt from taxation? Plaintiffs contend that it is municipal property used for municipal purposes, and that it is *ipso facto* exempt.

Even if we assume that it is "public property used exclusively for" a "public purpose," within the meaning of Article XII, Section 2 of the Constitution, it does not follow necessarily that it is exempt; for we have seen that this section does not of itself create any exemptions. It merely empowers the Legislature to pass laws exempting such property; and therefore the exemption does not exist unless it is created in "clear and unambiguous terms" by one of the sections of the General Code to which we have already referred.

However, let us carefully examine this contention of plaintiffs, so that we may determine whether this is in reality property which is used for a "public purpose," within the meaning of the Constitution.

A municipal corporation is possessed of a two-fold or double character. In the one aspect it is a social community, dealing with human beings and the problems to which their inter-relationship gives rise; in the other aspect it is a business community, concerning itself with the financial and commercial affairs which find expression in terms of the current coin of the realm. In the former aspect, it exercises ordinary legislative and governmental powers, aiding the state in properly governing that portion of its people residing within the municipality; in the other aspect, it exercises powers and is the recipient of privileges and franchises such as might be, and frequently are, conferred upon individuals or private corporations. And while the latter powers and franchises are public in their nature, in that they are conferred presumably for the public benefit, yet they may likewise be considered private, in that they result in special advantage, profit or benefit to the municipality as distinct from the public at large.

The former character may properly be designated *governmental, legislative* or *public;* the latter *proprietary* or *private.* In its governmental or public character, the municipality is made one of the instrumentalities of the state, for the purpose of exercising, in its behalf, certain limited and prescribed political powers. Over these powers the Legislature is, in the last analysis, absolutely supreme, unless in the state Constitution there is some limitation upon legislative control. In its proprietary or private character, the municipality exercises powers or functions which are conferred upon it in its corporate capacity, for the benefit of the legal entity which was created when the municipal corporation was chartered or organized. As to the latter powers and functions, and as to property acquired and contracts executed in the course of their exercise, the power of the Legislature is by no means omnipotent; for they are protected by the same constitutional guaranties as those which shield the property of individuals from legislative aggression. See *Board of Education* v. *Blodgett,* 155 Ill., 441.

The two-fold or dual nature of municipal administration is particularly important in two connections,—(a) in determining questions of liability for damages resulting from negligent execution of municipal powers, and (b) in considering the extent of legislative control. With the former, we have in this case, nothing to do; but with the latter we are seriously concerned.

This distinction has been universally recognized, one of the leading cases upon the subject being *Proprietors of Mount Hope Cemetery* v. *Boston,* 158 Mass., 509. In this case the court, consisting of men of splendid attainments, says (pp. 511-2):

"Over property which a city or town has acquired and holds exclusively for purposes deemed strictly public, that is, which the city or town holds merely as an agency of the state government for the performance of the strictly public duties devolved upon it, the Legislature may exercise a control to the extent of requiring the city or town, without receiving compensation therefor, to transfer such property to some other agency of the government appointed to perform similar duties, and to be used for similar purposes, or perhaps for other purposes strictly public in their character. * * *

''By a quite general concurrence of opinion, however, this legislative power of control is not universal, and does not extend to property acquired by a city or town for special purposes not deemed strictly. and exclusively public and political, but in respect to which a city or town is deemed rather to have a right of private ownership, of which it can not be deprived against its will, save by the right of eminent domain with payment of compensation. This distinction we deem to be well founded, but no exact or full enumeration can be made of the kinds of property which will fall within it, because in different states similar kinds of property may be held under. different laws and with different duties and obligations, so that a kind of property might in one state be held strictly for public uses, while in another state it might not be. But the general doctrine that cities and towns may have a private ownership of property which can not be wholly controlled by the state government, though the uses of it may be in part for the benefit of the community as a community, and not merely as individuals, is now well established in. most jurisdictions where the question has arisen.''

This distinction has also been frequently recognized by the Supreme Court of this state, and is specially referred to in the case of *Cincinnati* v. *Lewis, Auditor,* 66 Ohio St., 49, at p. 56:

''The description of municipal property which is exempt from taxation indicates with unmistakable accuracy that *the exemption is to extend to such property only as is actually employed in the exercise of municipal functions.*''

Again in the recent case of *Cincinnati* v. *Hynicka, Treasurer,* decided by. the Supreme Court without report (84 O. S., 446) the same distinction must have been recognized, for it was necessarily involved in the case, and was made the basis of argument by the successful counsel.

In 28 Cyc., 267-9, there is an interesting and exhaustive discussion of the two classes into which the functions of municipal corporations are divisible. These two classes are designated as the *governmental functions* and *municipal functions,* and numerous cases are cited in support of the propositions contained in the text. The subject is also treated in an instructive manner in *McQuillan on Municipal Corporations,* Section 87, where the

case of *Walker* v. *Cincinnati*, 21 Ohio St., 14, is cited as an illustration.   Indeed, we find absolutely no author of any repute who treats of the functions of municipal corporations, who does not call attention to the distinction to which we have been referring.   It may be, as said by Judge Dillon (Mun. Corp., Sec. 38), that the view that a municipal corporation possesses a double character "is true only in a modified sense"; but even that learned author subsequently recognizes and lays particular emphasis upon these differences in municipal functions (*Ibid*, Sections 39, 109, 1398, 1644).

It seems perfectly manifest to us that the Cincinnati Southern Railway is not employed by the municipality in the exercise of any purely governmental function.   It was built with the proceeds of bonds issued by the municipality itself.   It was a *public* property, created for *public* service, but it was owned by the city, and leased by it to the Cincinnati, New Orleans & Texas Pacific Railway Company, in its *proprietary character.*

Now even if we were to admit that certain exemptions may be implied from the nature of governmental institutions, the property with which we are now concerned could not be brought within that class which is exempt by implication.   In other words, such exemptions extend only to property employed in the exercise of functions governmental in character.   The rule is thus explained by Gray in his Limitations of Taxing Power (Section 1341):

"Municipalities are only *quasi*-governmental, and different considerations apply to the taxation of their property.   The general rule with respect to state taxation of the property of such corporations, sometimes regarded as an implied limitation arising out of the general nature of our public institutions, and sometimes expressed in written constitutional restrictions, is, that the Legislature may not tax—or rather, *will not be deemed to have intended to tax*—the property of municipal corporations owned and used by them in carrying out their strictly governmental functions, *but that the other property of such corporations, held for commercial purposes, or for the convenience or profit of its citizens, is subject to state taxation, at the will of the Legislature.*"

But we reiterate that we do not wish to be understood as admitting that there is in Ohio any such thing as tax-exemption by implication.   As we have heretobefore endeavored to indicate, the people were careful to specify in the Constitution just what property *might* be exempted by the General Assembly; and that body proceeded, in pursuance of the authority thus delegated to it, to specify what property was actually exempt.   Nothing is left to implication; but, as has already been said, the exemption must be found in plain, unambiguous words, or it does not exist. We are entirely content with the exercise of the judicial function of interpreting the existing law; we have no desire to usurp the legislative function.   Indeed, we do not hestitate to say that if the General Assembly had gone so far as to exempt public property *not* used exclusively for public purposes, its acts would be clearly unconstitutional and void.   *Zanesville* v. *Richards, Auditor,* 5 Ohio St., 590; *Fields* v. *Commissioners Highland County,* 36 Ohio St., 476; *State* v. *Jones, Auditor,* 51 Ohio St., 492, 505.

The case of *Cincinnati* v. *Lewis, Auditor,* 66 Ohio St., 49, is particularly in point.   In that case the city of Cincinnati sought to enjoin the collection of taxes upon certain real estate owned by it and known as the Markley farm, which was orginally purchased for the purpose of erecting a municipal water-works thereon.   The syllabus reads as follows:

"The ownership of lands by a municipal corporation does not bring them within any statutory exemption from taxation unless they are used in the exercise of a municipal function, and this is true although they are leased by the municipality and the money realized is applied to a public purpose."

The court says (pp. 55-6) :

"That the public ownership of property was not alone thought sufficient to exempt it from taxation is made obvious by the requirement that an exclusive use for a public purpose shall coincide with such ownership."

And again (pp. 56-7) :

"The description of municipal property which is exempt from taxation indicates with unmistakable accuracy that the exemption is to extend to such property only as is actually employed in the exercise of municipal functions. If this conclusion were doubtful it would nevertheless be required by the established rule that all exemptions from taxation are to be strictly construed."

This case is distinguished by the learned counsel for plaintiffs, from the case at bar, by the fact that the public use had been abandoned. But the truth of the matter is that although the *public ownership* continued, and although the revenue derived from the rental of the land was employed for purely *public purposes*, yet the property was, by the change in use, taken out of a specifically exempted class, and it became therefore the subject of taxation.

The suggestion is made that because the property in question is owned by the municipality, and the revenue therefrom is devoted to municipal uses, it is not logical to diminish that revenue by taxation for public purposes. This objection, however, is more specious than substantial, for it must be remembered that, in the language of the court in *Cincinnati* v. *Lewis, Auditor, supra*, "the tax collected is not for the benefit of a municipality alone, but also for that of the state and county."

Counsel for plaintiffs, in an elaborate and scholarly brief, lay much stress upon the case of *The United States* v. *Railroad Co.,* 17 Wall., 322, and point out that it is conclusively against the contention of the defendants. That case arose out of an effort on the part of the Federal Government to tax, under the Internal Revenue Act, bonds issued by the city of Baltimore, the proceeds of which were lent to the Baltimore & Ohio Railroad Company. It was held by the Supreme Court of the United States that the Federal Government could not tax the means and instrumentalities employed by a municipal corporation in the performance of its municipal or public duties. The court animadverted to the fact that the city of Baltimore was acting as an arm of the state, which might have compelled it, against its assent, to lay the tax and make the appropriation to the railroad

company. Now it is perfectly manifest that the Federal taxing power can not be employed to impede the operations of the state governments, which existed before the Federal government was organized: *Collector* v. *Day*, 11 Wall., 113; *Pollock* v. *Farmers Loan & Trust Co.*, 157 U. S., 429; 158 U. S., 601. It therefore logically follows that the same power is impotent to reach the operations of an arm of the state. The state, however, is not thus handicapped in its control over its own municipalities, whose powers it may enlarge, contract or destroy at its pleasure.

There surely can, at this late date, be no denial of the power of the Legislature, in the absence of express constitutional restrictions, to authorize taxation to pay for railroad stock, or for bounties for railroads (*Railway* v. *Commissioners*, 1 Ohio St., 77; *Cass* v. *Dillon*, 2 Ohio St., 607; *State* v. *Trustees*, 8 Ohio St., 394; *Walker* v. *Cincinnati*, 21 Ohio St., 14; *Perry* v. *Keene*, 56 N. H., 514; *Sharpless* v. *Mayor*, 21 Pa., 147; *Gelpcke* v. *Dubuque*, 1 Wall., 175; *Railroad* v. *Otoe*, 16 Wall., 667). But it certainly does not follow that the property of the railroad is exempt from taxation merely because of a municipal stock subscription or bounty. The consideration for such exemption would have to move from the other party. *Railway Company* v. *Trempealeau County*, 93 U. S., 595.

Counsel for plaintiff cite the Fulton Ferry case (*People* v. *Assessors*, 111 N. Y., 505). That case contains a clear, unequivocal recognition of the distinction to which we have repeatedly referred. The first paragraph of the syllabus reads:

"The property of a municipality, *acquired and held for governmental and public uses*, and used for public purposes, is not a taxable subject within the purview of tax laws, unless specially included."

The court admits (p. 509) that the Legislature might have made the landing place taxable, but states that it did not do so. It then says:

"We prefer to express no opinion on the question whether there is, in principle, a distinction between taxation of the property of a municipality strictly devoted to public uses, and

property which it owns  *  *  *  but the acquisition or holding of which has no essential connection with the public functions of the municipality."

If the case can be said to support plaintiff's contention, we need only reply that in the case of *Cincinnati* v. *Hynicka, Treasurer, supra,* it was held by our Supreme Court that not only was municipally owned wharf property taxable, but it was also saleable for delinquent taxes.

Counsel for plaintiffs also cite the case of *Rochester* v. *Rush,* 80 N. Y., 32, which held that the town of Rush had no authority to tax a portion of the water works of Rochester located within the corporate limits of Rush. That case would undoubtedly be good law in Ohio—largely because Section 5357 of the General Code of Ohio specifically exempts water works properties and fixtures.

The case of *Boston* v. *Boston, etc., Ry. Co.,* 170 Mass., 95, is also cited; but it is a sufficient answer to say that the facts in that case are so dissimilar to those of the case at bar as to leave it absolutely valueless in the present discussion. It had to do with an attempted special assessment of the land of a railroad lying within its right-of-way, for sidewalks in adjacent streets. The decision was avowedly based upon the law of Massachusetts which exempts the lands of railroad companies lying within their locations, not to exceed five rods in width. No such exemption exists in Ohio, and an absolutely opposite view of the case cited was expressed by our Supreme Court in the case of *Railway Co.* v. *Connelly,* 10 Ohio St., 159, approved and followed in *Railway Co.* v. *Belmont County,* 19 Ohio St., 589.

We are thus constrained to arrive at the conclusion that the property described in the petition is not exempt from taxation, because it is not employed in the exercise of any exclusively governmental function and is not within any of the classes of property specifically exempted by statute; and we pass now to a consideration of the second cause of action.

This cause of action is based upon a contention that Section 5399 of the General Code (a part of the so-called Smith One

Per Cent. law, passed May 10, 1910; 101 O. L., 430, 433) forbade the listing for taxation by the County Auditor of any property omitted from the duplicate prior to the year 1911. So far as it is necessary for us to consider this section, it reads as follows:

"If any person required to list property, or make a return thereof for taxation to the assessor or county auditor, or to a board, officer, or person, other than a board composed of officers of more than one county, in the year 1911, or in any year or years thereafter fails to make a return or statement * * * the county auditor for each year as to such property omitted * * * shall ascertain as near as practicable the true amount of personal property, moneys, credit and investments that such person ought to have returned or listed, and the true value at which it should have been taxed in his county for not exceeding the five years next preceding the year in which the inquiries and corrections provided for * * * are made, and not in any event prior to the year 1911. * * * The term 'personal property' as used ·in this section shall apply to all kinds of omitted property for the taxation of which, for any of the years in which it was omitted, provision has not been made by law."

This section refers in plain words to persons "required to list property," and its avowed purpose is to bring to light taxable personal property which has been illegally secreted. Now as there is no provision made for the return of municipally owned railroad property, the county auditor is required by the terms of Section 5574 of the code, to place such property upon the duplicate if it has been omitted therefrom.

That the provision of the Code upon which plaintiffs rely has no bearing upon the case at bar is made manifest by the act of May 31, 1911 (102 O. L., 266; General Code, Section 5403-1):

"From and after the passage of this act no county auditor, assessor or other officer shall place upon the tax list or duplicate for taxation as of the year 1910, or as of any year preceding said year, any *personal* property which should have been assessed for taxation as of such year, but which was not returned for taxation therein." * * *

This act is a part of Chapter 3, Title I, Part II of the General Code, relating to "The Listing of Personal Property," and was

passed solely to supply a limitation upon Section 5399. It has no bearing upon Section 5574, which is found in Chapter 10 of the same title, relating to "The Assessing of Real Estate."

It must not be assumed that the collection of taxes for previous years, omitted from the duplicate by design or mistake, is necessarily illegal. The Legislature may, unless forbidden or controlled by constitutional provision, authorize a municipality to collect retrospective taxes upon property which, though subject to taxation, was omitted from the assessment roll for any reason whatever: *Dillon, Municipal Corporations,* Section 1400; *Cooley, Taxation,* pp. 492 *et seq.; Wilcox* v. *Eagle,* 81 Mich., 271; *People* v. *Assessor,* 92 N. Y., 430; *Sanderson* v. *Herman,* 108 Wis., 662; *Lumber Co.* v. *McCrimmon,* 164 Fed., 759, 762; *Railway Co.* v. *Reynolds,* 183 U. S., 471. In the case last cited, Mr. Justice Brewer said:

"It must be remembered that taxes are not debts in the ordinary sense of the term; that they are the enforced proportional contribution of persons and property, levied by the authority of the state for the support of the government, and for all public needs. They are obligations of the highest character, for only as they are discharged is the continued existence of the government possible. They are not canceled and discharged by the failure of duty on the part of any tribunal or officer, legislative or administrative. Payment alone discharges the obligation, and until payment the state may proceed by all proper means to compel the performance of the obligation. No statutes of limitation run against the state, and it is a matter of discretion with it to determine how far into the past it will reach to compel the performance of its obligation."

And so it has been held that an assessment for past years upon omitted property may be made although the property has passed out of the ownership of the person assessed, or out of the assessment district, or even out of existence. *State* v. *Pors,* 107 Wis., 420.

We therefore conclude that the county auditor did not exceed his authority in placing this property upon the tax duplicate on April 8, 1911.

We come now to the third and last point made by plaintiffs, in their third cause of action.    We can not agree with counsel for defendants that by reason of the incorporation in this cause of action of the allegations of the first cause of action, an inconsistency has arisen which is fatal to plaintiffs' claim.    The test is whether the allegations of the several portions of the pleading are so far consistent as to make it possible for a person to verify them by oath without swearing falsely (*Glass* v. *Heffron,* 86 Ohio St., 70, 74).    We think that in this case the allegations amount to nothing more than this:  "We, the plaintiffs aver that no portion of this property has *in fact* been turned over to the lessees of the Cincinnati Southern Railway; but even if the court should determine that, *as a matter of law,* the property has passed to said lessees under the terms of our lease, then," et cetera.    This is not an irreconcilable inconsistency, nor can we accuse plaintiffs of perjury in making the allegations.

The act of May 10, 1910 (101 O. L., 399), creating a tax commission for this state, and investing it with the control of public utilities, was not intended to, and did not in fact, give that commission any control over the property of municipal corporations.    Section 71 of the act (101 O. L., 414) provided that:

"This act shall not be construed so as to require any municipal corporation within the state to make any return or pay any taxes under any provision of this act."

To summarize, then, we find that on April 8th, 1911, the property in question was owned by the city of Cincinnati; that it had not yet been turned over to the Cincinnati, New Orleans & Texas Pacific Railway Company, lessee of the Cincinnati Southern Railway; that it was taxable under the laws of Ohio; that it was not subject to the provisions of the act of May 10, 1910, and that the county auditor was not prevented by operation of law from placing it upon the tax duplicate for the year 1910.    We are accordingly constrained to sustain the demurrer of defendant to each of the three causes of action, and to dissolve the temporary injunction heretofore granted.

We confess that we have arrived at this conclusion only with great reluctance. The courts·may very properly take judicial notice of the vast importance to the city of Cincinnati of this, the only municipally owned railroad in the world, and we would not lightly do aught to diminish its revenues or circumscribe its operations. But we are endeavoring to interpret the law as we find it, not as we would have urged the makers of the Constitution to make it.