BOARD OF ASSESSORS OF SHARON *vs.* KNOLLWOOD CEMETERY
(and two companion cases).

Suffolk.    March 4, 1969. — April 8, 1969.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER, & KIRK, JJ.

*Cemetery.    Taxation,* Real estate tax: exemption, cemetery.

All of a tract of land acquired by a cemetery corporation in 1898 was
exempt from taxation in 1962 under G. L. c. 59, § 5, Twelfth, "as
dedicated to the burial of the dead," even if the tract would "not be
[fully used] for approximately sixty years" thereafter and it was
possible that unused land might be sold by the corporation in the
future, where it appeared that the corporation had engaged in "ac-
tivity . . . to prepare the land for burial purposes" since its or-
ganization, that the entire cemetery had been laid out by sections on
paper since 1899, that lots had been sold, actual interments made, and
development work undertaken in large parts of the tract, that the
corporation had used, and planned to use, its developed and un-
developed land "for burial purposes only," and that an amendable
agreement restricted use of the tract to such purposes [590]; and an
administration building on the tract and a nursery therein for trees
and shrubbery raised for transplanting to other parts of the cemetery
were also entitled to exemption under c. 59, § 5, Twelfth [590].
The exemption of cemeteries from taxation under G. L. c. 59, § 5, Twelfth,
does not depend upon compliance with the provisions of c. 114, § 34.
[591]
It is immaterial to the question of exemption from taxation of property
of a cemetery corporation under G. L. c. 59, § 5, Twelfth, whether the
corporation is "operated as a private enterprise for profit."   [591]

APPEALS from decisions by the Appellate Tax Board.

*Manuel Katz* for the Board of Assessors of Sharon.

*Donald N. Sweeney* (*Marshall Simonds & Leonard Wheeler*
with him) for the taxpayer.

CUTTER, J.   The Appellate Tax Board ordered abate-
ment of all taxes assessed for the years 1962 through 1965
on three land areas in Sharon and Canton owned by Knoll-
wood Cemetery (Knollwood).   The board held that Knoll-

wood was exempt from taxation under G. L. c. 59, § 5, Twelfth. The Sharon assessors appealed. The facts, except as otherwise indicated, are stated on the basis of the board's findings and report, made at the request of the Sharon assessors.

By St. 1898, c. 207 (later amended in respects not here material by St. 1901, c. 183, § 1), Knollwood was created "for the purpose of purchasing, holding, managing and perpetuating a place for the burial of the dead" in Sharon and Canton, subject to the approval of a majority of the voters of each town. Knollwood (§ 1) was to "have all the powers and privileges and be subject to all the duties . . . contained in all general laws . . . now . . . or . . . hereafter . . . in force relating to such corporations." It was expressly authorized (§ 3) to purchase land [1] for a cemetery in the manner in which Knollwood later did buy its land. The voters in each town gave consent in April, 1898. [2]

By recorded agreement (the Cameron agreement) dated May 27, 1898, Knollwood undertook to acquire from John J. Cameron, acting for himself and several associates, land in Sharon and Canton. This agreement is summarized in the margin. [3]

---

[1] Statute 1898, c. 207, § 3, provides that Knollwood "may agree with . . . persons from whom any lands are purchased . . . to pay therefor a specified share not exceeding one half of the proceeds of all sales of the use of lots . . . and such share shall be first applied to the payment of such purchase money, and the residue thereof shall be applied to the preservation, improvement and embellishment of the cemetery grounds and to . . . expenses of the association. . . . [T]he prices for the use of lots . . . in force when such purchase was made shall not be decreased while the purchase price remains unpaid, without the written consent of a majority in interest of the . . . persons from whom the lands were purchased, their heirs . . . or assigns."

[2] The Sharon vote approved "the location of Knollwood Cemetery, according to" St. 1898, c. 207, which described the proposed cemetery as partly in Sharon and partly in Canton and provided that it "shall not be located south of a line drawn east and west from a" designated point in Sharon.

[3] The Cameron agreement recites (1) that Cameron, for himself and associates, has conveyed six parcels to Knollwood, and (2) that the interests of the vendors have been divided into 15,000 shares. The agreement then provides (see fn. 1): (1) that the land "or such parts thereof [as] may from time to time be required for [c]emetery purposes, shall be . . . subdivided into lots . . . for burial and ornamental purposes with . . . avenues, paths and walks . . . and" shall be sold by Knollwood at prices not to be changed without the written consent of a majority in interest of the shareholders;

From the time of Knollwood's incorporation, it engaged in "activity . . . to prepare the land for burial purposes." In 1901, "consecration exercises were held on the cemetery grounds . . . to dedicate the property for burial purposes." The assessors concede that between 1898 and 1948, 9.78 acres south of Canton Street, Sharon, had been prepared for use for burial and that eighteen bodies had been interred north of Canton Street.

"Around 1907 . . . [Knollwood] ran into financial trouble and required reorganization and refinancing." It continued, however, "to operate exclusively for the burial of the dead."

The entire cemetery has been laid out by sections on paper since 1899. Some of the early roads in undeveloped areas "were crude" and still remain so. "A unified grid system is used by which all of the land can be identified." Knollwood has expended substantial sums in development "as the need for lots arises" and funds from sales are received. Between 1948 and 1965 Knollwood sold 42,566 burial spaces.

Actual interments have been made in both Sharon and Canton. The property was not taxed by either town prior to 1962 when Sharon first levied a tax. Canton first taxed cemetery property in 1964. The Sharon assessors "considered as exempt . . . the actual burial ground, land prepared for burials which had paved roads, and also a strip of land 150 feet wide adjoining the described area." The rest of the land, they considered undeveloped and treated it as not dedicated to the burial of the dead.

In Sharon, Knollwood owns about 199 acres. From 1962

(2) that Knollwood will pay the vendors for the land, "one half of all the proceeds of all sales of the use of lots"; (3) that this half of the proceeds shall be distributed among the shareholders; (4) that certificates for shares shall be issued "and may be transferred by the . . . [vendors] or their legal representatives or assigns on the books" of . . . Knollwood; (5) that Knollwood will "appropriate the residue of . . . [the] proceeds to . . . improving and embellishing the lands . . . and defraying . . . [Knollwood's] expenses"; and (6) that the agreement, except with respect to the shareholders' and Knollwood's interests, "may be altered . . . by the written consent of two thirds in interest of the . . . parties" or their assigns.

through 1964, Sharon taxed eighty-five acres of land and a half-acre parcel containing a new administration building. In 1965 the Sharon assessors reduced the taxed land area from 85 to 78.5 acres [4] and also taxed the new administration building and the one-acre nursery for trees and shrubbery raised for transplanting to other parts of the cemetery.

Some undeveloped land cannot be used for underground burial. Knollwood on these areas proposes to build mausoleums which will house caskets for aboveground burial. It plans to use all undeveloped land only for burial purposes and estimates that it will take sixty years to fill the cemetery. There remain about 145,000 individual lots which can be developed as need arises. Knollwood does not have funds to develop the whole unused acreage now. No activity other than the operation of a cemetery has been conducted on Knollwood's land.

The board concluded that all Knollwood's property is dedicated to the burial of the dead. It recognized that Knollwood's land "will not be [fully used] for approximately sixty years."

1. General Laws c. 59, § 5, reads: "The following property shall be exempt from taxation . . . Twelfth, Cemeteries, tombs and rights of burial, so long as dedicated to the burial of the dead." [5] This exemption has existed at least since St. 1841, c. 114, § 7. See *Milford* v. *County Commrs. of Worcester*, 213 Mass. 162, 166; Nichols, Taxation in Massachusetts (3d ed.) 247–248. In the *Milford* case, this was described (p. 167) as a "special and limited exemption confined to land devoted to cemeteries." It was held (pp. 165–166) that such corporations were not

---

[4] A 1963 plan divided into two sections Knollwood's land in Sharon, viz. parcel 1 (136.2 acres) and parcel 2 (63.2 acres). The land assessed in 1962 through 1965 was in parcel 1. Of the total parcel 1 acreage in Sharon about 69 acres are developed and are used for burial.

[5] By St. 1966, c. 262, cl. Twelfth was amended by adding at the end the words, "and buildings owned by religious non-profit corporations and used exclusively in the administration of such cemeteries, tombs and rights of burial."

exempt under the general charitable organizations exemption now found in c. 59, § 5, Third.[6]  See *Bullock* v. *Commissioner of Corps. & Taxn.* 260 Mass. 129, 132–134; *Proprietors of the Cemetery of Mt. Auburn* v. *Unemployment Compensation Commn.* 305 Mass. 288, 293–297.

The assessors place great emphasis upon *Woodlawn Cemetery* v. *Everett,* 118 Mass. 354.  In that case, an existing cemetery corporation (p. 356) proposed to buy an adjacent farm for cemetery purposes.  The town declined to vote consent to the use of the land for burial purposes.  The corporation proceeded to purchase the property and voted that it "dedicate" the land "to the purposes of a cemetery." It notified the town of its action.  The town proceeded to tax the land.  The only use (p. 357) of the land for cemetery purposes was the occupation of a house by the cemetery gardener, the storage of cemetery supplies, and the conduct of a hothouse and an evergreen nursery, but (pp. 357, 362) "*no part* of this land . . . [had] been used . . . for burials, or divided off or laid out into lots or permanent avenues, [n]or [had] any attempt been made to sell . . . for purposes of burial" (emphasis supplied).  This court held (p. 363) that the purchased land was not exempt.  Chief Justice Gray said (p. 361): "No land can be deemed to be 'dedicated' for . . . a . . . burial place . . . so as to be exempt from taxation, or 'used or appropriated' for . . . a burial ground, so as to entitle the owner to use it for that purpose for the future without municipal permission, which has not been devoted *or set apart,* and *some active measures taken* toward preparing the ground, for a burial place.  A mere dedication or appropriation on paper is not enough" (emphasis supplied).  It was held (p. 362) that the minor use of the purchased land for activities incidental to a cemetery

---

[6] For earlier cases dealing with the tax exemption of cemeteries, see *Proprietors of Rural Cemetery* v. *County Commrs. of Worcester,* 152 Mass. 408, 411 (exemption construed as applicable to buildings and additional property required for the business of operation of the cemetery); *Proprietors of Mt. Hope Cemetery* v. *Boston,* 158 Mass. 509.  In the year following the *Milford* decision, St. 1913, c. 578 (see also St. 1914, c. 523), made the provision now found in G. L. c. 59, § 5, Thirteenth, with respect to personal property of certain cemeteries.

did not constitute "dedication of such land . . . for . . . a
. . . burial place."

The *Woodlawn* case is not controlling. From shortly after
Knollwood's incorporation, the limits of the land acquired
by it for cemetery purposes have been known. The board's
findings show that there were in the early years some de-
velopment and use for burials of the land acquired in 1898.
Very considerable development and use of large parts of the
land for burials have taken place since. The sale of 42,566
burial lots in a seventeen year period alone is ample indica-
tion of "active measures" taken well before 1962, directed
to use of the land for burials, totally lacking with re-
spect to the purchased land considered in the *Woodlawn*
case.

Chapter 59, § 5, Twelfth, cannot reasonably be inter-
preted as requiring that, to qualify for exemption, *all* land
acquired (with municipal consent) for burial purposes must
be developed at one time. It must be expected that a
cemetery corporation, in making land purchases, will an-
ticipate its future needs for a period of time and that it will
prudently develop its property in an orderly fashion as the
need for doing so arises. We think that the planning and
substantial actual use of parts of a defined area of land for
cemetery purposes may properly be found, within the mean-
ing of c. 59, § 5, Twelfth, to constitute a dedication of the
whole of that land to cemetery use, in circumstances such
as appear in the present case. We perceive nothing to the
contrary in *Trefry* v. *Younger*, 226 Mass. 5, 8, or in *Pro-
prietors of the Cemetery of Mt. Auburn* v. *Cambridge*, 150
Mass. 12, 13.

The assessors somewhat vaguely contend that to have a
dedication of land to cemetery purposes, there must exist
no likelihood that the land will be used for other purposes
by reason of a future sale of unused land by the cemetery
corporation. It is suggested (see *Donnelly* v. *Boston Catholic
Cemetery Assn.* 146 Mass. 163, 166; *Garden Cemetery Corp.* v.
*Baker*, 218 Mass. 339, 343) that Knollwood may appropriate
or sell its land for general purposes.

The board was warranted in finding that Knollwood has used its property, and plans to use it, "for burial purposes only." The Cameron agreement (see fn. 3), unless amended, in effect restricts use to cemetery purposes. We assume that, after appropriate corporate action and obtaining consent of the shareholder successors to the vendors, Knollwood may sell for general use parts of its land not theretofore used for burials. Nevertheless, we think that Knollwood's substantial use of the land for burials has been sufficient within the meaning of c. 59, § 5, Twelfth, to constitute dedication of all the land acquired in 1898 to cemetery use and to give rise to its exemption "so long as [the land is] dedicated to the burial of the dead." This language of clause Twelfth indicates to us that the statute, as a basis of exemption, looks to the situation at the time of assessment despite the possibility of future change. Similar considerations apply to buildings on the cemetery land and a tree nursery used in, and necessary for, administration and operation of the cemetery.

2. The assessors contend that the board did not make adequate subsidiary findings to support its decisions and that some of its findings were not warranted. Examination of the testimony and exhibits convinces us that the board's findings, already summarized, were adequate and were warranted by substantial evidence.

The first finding criticised by the assessors (that Knollwood "may not sell its land") in context merely purports to describe the Cameron agreement (fn. 3). It is irrelevant, as has been indicated, that the possibility exists that hereafter some parts of the land, in probably unlikely circumstances, may be used for general purposes.

A second finding, said to be unwarranted, is that from its incorporation Knollwood "engaged in [activity] to prepare the land for burial purposes." Read with later detailed findings, this finding reasonably reflects the evidence. Prior to 1948, the efforts (irrelevant now because long prior to the years of the taxes under discussion) to promote use of the cemetery were plainly more sporadic and less effective than

after 1948, when substantial activity began under new management. The testimony concerning activity after 1948 amply supports the board's findings about the use of the land in the years for which taxes have been assessed.

The assessors also suggest that the board had insufficient basis for concluding that Knollwood "has adhered to the requirements of . . . statutes concerning cemeteries." There was testimony that no approval by the Sharon board of health was sought for development after 1948 of certain portions of Knollwood's land. The assessors contend that failure to seek such approval was a violation of G. L. c. 114, § 34, requiring it for use of "land, *other than that already* . . . used or *appropriated*" (emphasis supplied) for cemetery purposes. This requirement of approval was enacted by St. 1908, c. 379, § 1, ten years after Knollwood had acquired its land in 1898 and had taken significant action to dedicate some portions of it to burial use. Not only does Knollwood seem within the quoted exclusion from the operation of § 34 of land already appropriated to cemetery use, but also nothing in c. 59, § 5, Twelfth, makes exemption depend upon compliance with § 34.

3. The assessors contend that the board erroneously admitted testimony and exhibits concerning Knollwood's early history and sales efforts and its plans for the future. This evidence was relevant in applying the principles of our decisions concerning dedication of real estate to cemetery use, and in explaining the purpose of Knollwood's past and current activities.

4. The board did not err in denying two requests by the assessors for rulings. The first request argued stated that Knollwood "is a private cemetery corporation operated as a business enterprise for profit." The ruling, in any event, is irrelevant. Exemption under c. 59, § 5, Twelfth, is granted to a cemetery "so long as dedicated to the burial of the dead." Whether it makes a profit is immaterial. The second request argued has been discussed already. Even if

Knollwood has not complied with G. L. c. 114, § 34, this does not bar tax exemption under clause Twelfth.

5. The decisions [7] of the Appellate Tax Board are affirmed. Knollwood is to have costs of appeal.

*So ordered.*

---

[7] It is stipulated that each pending case presents substantially the same issues of law and that various cases, the records in which have not been printed, are to be governed by our decision.